IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

FEB 11 2010

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

SIERRA CLUB, NATIONAL AUDUBON SOCIETY,
AUDUBON ARKANSAS, CHARLES MILLS
AND GRANVILLE PARNELL                                    **PLAINTIFFS**

v.                                    No:  __10-4017__

UNITED STATES ARMY CORPS OF
ENGINEERS, AND COLONEL
JEFFREY R. ECKSTEIN, District Engineer,
Vicksburg District, U.S. Army Corps Of Engineers          **DEFENDANTS**

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND FOR
## PRELIMINARY AND PERMANENT INJUNCTIONS

Come the plaintiffs, Sierra Club, National Audubon Society, Audubon Arkansas, Charles

Mills and Granville Parnell, and for their cause of action against the defendants, United States

Army Corps of Engineers and Colonel Jeffrey R. Eckstein, District Engineer, Vicksburg District,

U.S. Army Corps of Engineers, state:

### *NATURE OF THE CASE*

1.      This Complaint seeks declaratory and injunctive relief against the United States Army

Corps of Engineers, Vicksburg District ("COE"), for its failure to comply with the National

Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§4321 – 70a; the implementing

regulations for NEPA issued by the White House Council on Environmental Quality ("CEQ" and

"the CEQ Regulations"), 40 C.F.R. §§1500 – 08; regulations issued by the COE, 33 CFR Part

230 ("the COE Regulations"); and regulations issued by the U.S. Environmental Protection

Agency , 40 CFR Part 230 ("the EPA Regulations"), implementing NEPA; the Federal Water

Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §1344, and regulations implementing 33 U.S.C. §1344.

2.     The action arises from the COE's final agency action in the issuance of a Department of the Army Permit ("the Permit") on December 17, 2009, to Southwestern Electric Power Company ("SWEPCO," or "the Applicant"), based upon a "Department of the Army Permit Evaluation and Decision Document ("the PEDD") dated December 15, 2009, signed by Colonel Michael C. Wehr, then District Engineer of the COE's Vicksburg, Mississippi District, and other documents prepared by the COE, SWEPCO and its consultants as part of Department of the Army Permit Application No. MVK-2006-1903.

3.     The Permit authorizes the filling of approximately 8.07 acres of jurisdictional wetlands, including 2.47 acres of after-the-fact wetlands impacts, and approximately 8,150 linear feet of stream impacts, including after-the-fact temporary impacts to an additional 645 linear feet of stream.

4.     Such activities are incidental to and part of the construction of the John W. Turk, Jr. power plant by SWEPCO in Hempstead, Miller and Little River Counties, Arkansas, near the confluence of the Little River and the Red River near Fulton, Arkansas (herein referred to as "the Project").

5.     In approving the PEDD and issuance of the Permit, the COE failed to comply with the procedures for gathering information, public participation, and decision-making set forth in NEPA and in the CEQ, COE and EPA regulations implementing NEPA's mandates, as more fully described herein. Specifically, but without limitation, the COE failed to comply with the notice and comment requirements and the substantive requirements of NEPA, its implementing regulations, and the Clean Water Act and its implementing regulations. The COE's procedures,

findings, conclusions, and actions in approving the PEDD and issuance of the Permit were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (5 U.S.C. §706(2)(A)), as more fully described herein.

6.      While the COE allowed SWEPCO to commence development of the site for the Project prior to the issuance of the Permit, the COE cautioned SWEPCO that such development would be at SWEPCO's risk. SWEPCO has stated that it cannot continue construction without taking actions under the Permit, and SWEPCO's continued construction of the Plant pursuant to the activities authorized by the Permit will cause irreparable harm to the wetlands, the Little River, and other environmentally-sensitive portions of the Project area. The Corps should be restrained and enjoined from allowing the work authorized by the Permit to proceed unless and until the Corps has fully complied with the requirements of NEPA and its implementing regulations as described herein.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 USC §1331 (Federal Question); 28 USC §1361 (Mandamus); 28 U.S.C. §1651 (Writs); 28 U.S.C. §§2201-02 (Declaratory Judgment Act); and 5 U.S.C. §§701 *et seq.* (Administrative Procedure Act).

8.      Defendants, United States Army Corps of Engineers and Colonel Jeffrey R. Eckstein as current District Engineer of the Vicksburg District have waived sovereign immunity pursuant to 5 U.S.C. §702.

9.      Venue of this action is proper in this Court under 28 U.S.C. §1391(e), in that a substantial part of the events or omissions giving rise to the claims occurred, and the property that is the subject of the action, is situated in this District and Division.

## PARTIES

10.     Sierra Club is a not-for-profit organization dedicated to the protection and preservation of the environment and our natural resources. Sierra Club is one of the oldest and largest conservation groups in the country, with over 700,000 members nationally in sixty-four chapters in all of the 50 states, the District of Columbia and Puerto Rico. Approximately 3,000 residents of Arkansas are members of the Arkansas chapter of the Sierra Club. Approximately 40 of those members reside in the vicinity of the proposed SWEPCO plant, and hunt, fish, and enjoy observing wildlife, birdwatching, hiking, camping and being in nature. However, the environmental effects of the SWEPCO plant will extend throughout Arkansas, and members of the Sierra Club in Central Arkansas who hunt, fish, and enjoy observing wildlife, birdwatching, hiking, camping and being in nature are concerned about the effects of the plant. Sierra Club brings this action for itself and as representative of its members in the State of Arkansas.

11.     The National Audubon Society is a not-for-profit organization dedicated to the preservation of birds, waterfowl, wildlife and their habitat, and the protection and preservation of the environment and natural resources. It has over one million members in twenty-three states, and has a presence in all 50 states, including Arkansas, through more than 450 certified chapters and through its sanctuaries, nature centers and educational and scientific programs. National Audubon Society brings this action for itself and as representative of its members in the State of Arkansas.

12.     Audubon Arkansas is a not-for-profit organization with the same goals and objectives as the National Audubon Society. It has approximately 3,500 members in the State of Arkansas, including members who reside in the vicinity of the SWPCO plant. Approximately 40 of those

members reside in the vicinity of the proposed SWEPCO plant, and hunt, fish, and enjoy observing wildlife, birdwatching, hiking, camping and being in nature. However, the environmental effects of the SWEPCO plant will extend throughout Arkansas, and members of Audubon Arkansas who hunt, fish, and enjoy observing wildlife, birdwatching, hiking, camping and being in nature are concerned about the effects of the plant. Audubon Arkansas brings this action for itself and as representative of its members in the State of Arkansas.

13. Plaintiff, Charles Mills ("Mills") is an individual citizen and resident of Ogden, Little River County, Arkansas. Mr. Mills owns and resides on property in the vicinity of the Project site. Mr. Mills is a member of the plaintiff, Audubon Arkansas; is an outdoor enthusiast who engages in nature observation, bird watching and nature photography in the State of Arkansas in general and in the Project site area in particular; and who is concerned with the consistent and on-going loss of natural resources, wildlife habitat and wetlands, including the loss of wooded and wetlands areas as a result of construction of the Project. Mr. Mills is also concerned with the effect of the Project on air quality in the Project area, in Arkansas and in Wilderness areas; the effect of the Project on his safety and the safety of others; and the effect of the Project on noise, lighting and other environmental and aesthetic effects in the Hempstead, Little River, Howard and Miller Counties area of Arkansas.

14. Granville Parnell is an individual citizen and resident of the City of Nashville, Howard County, Arkansas. Mr. Parnell owns and resides on property located in the vicinity of the Project Site. Mr. Parnell is a conservationist and nature observer whose personal interests involve observations of natural areas, and enjoyment of bird and wildlife. Mr. Parnell is concerned with the consistent and on-going loss of natural resources, wildlife habitat and wetlands, including the loss of wooded and wetlands areas as a result of construction of the

Project. Mr. Parnell is also concerned with the effect of the Project on air quality in the Project area, in Arkansas and in Wilderness areas; the effect of the Project on his safety and the safety of others; and the effect of the Project on noise, lighting and other environmental and aesthetic effects in the Hempstead, Little River, Howard and Miller Counties area of Arkansas.

15.     Defendant, United States Army Corps of Engineers ("COE"), is an agency within the United States Department of the Army, which, in turn, is a department within the United States Department of Defense, a Department of the Executive Branch of the United States of America. The COE has been delegated responsibility for, among other things, construction, management, operation and regulation of various lakes, rivers, streams and other water resources of the United States of America, and for issuance of permits for the discharge of dredge and fill materials into the waters of the United States.

16.     Defendant, Colonel Jeffrey R. Eckstein, is sued in his official capacity as current District Engineer of the Vicksburg, Mississippi District of the COE. Colonel Eckstein is the successor to Colonel Michael C. Wehr, formerly District Engineer for the Vicksburg District of the COE, who approved the PEDD dated December 15, 2009 and signed the Permit dated December 17, 2009. Col. Eckstein currently is responsible on a daily basis for, among other things, implementing the policies, procedures and requirements of the COE and applicable statutes and regulations relative to certain water resources and COE-owned or operated properties within the Vicksburg District, of which the Project area is a part, and for the issuance of permits under Section 404 of the Clean Water Act (33 U.S.C. §1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. §403). During the time that the Permit was issued, and at all times during the performance of the activities described herein, Colonel Wehr was the

COE official directly responsible for ensuring that the PEDD and the Permit complied with all applicable NEPA and COE regulations and requirements.

### *FACTUAL BACKGROUND*

17.     SWEPCO submitted a Permit Application assigned No. MVK-2006-1903 to the U.S. Army Corps of Engineers for a permit required under Section 404 of the Federal Clean Water Act, 33 U.S.C. §1344, and Section 10 of the Rivers and Harbors Act, 33 U.S.C. §1344) to dredge and fill regulated wetlands and stream banks on and near the plant site, as well as to fill or otherwise impact wetlands in areas in which electrical transmission lines will be strung.

18.     The Project site encompasses approximately 2,800 acres of previously forested land, containing jurisdictional wetlands, located in Sections 32 and 33, Township 12 South, Range 26 West; Sections 4, 5, 6, 7, 8, 9, 16, 17, 18 and 19 in Township 13 South, Range 26 West, and Sections 13 and 24, Township 13 South, Range 27 West, Hempstead County, Arkansas, near the confluence of the Little River and Red River.

19.     The property is proposed to be used as the location of a coal-fired, 600-megawatt electrical generation plant and associated structures, including the power block, cooling towers, administrative building, parking areas and stacks. The proposed project will also include a coal yard in which coal will be stored for use as fuel; relocation of two county roads; construction of rail spurs on which coal will be delivered to the plant from Wyoming; construction of a water intake pump site on the bank of the Little River in which a 6500 gallon/minute pump will be located, and lines to distribute the water to the plant; cooling ponds and settling ponds; and electrical transmission lines from the main facility, south and west to existing substations near Texarkana, and east to an existing 115-Kv transmission line.

20.     The Permit authorizes SWEPCO to place fill material in or otherwise impact approximately 8.07 acres of wetlands (5.6 acres of proposed impact and 2.47 acres permitted after-the-fact impact), and 8,150 linear feet of jurisdictional stream channels on the site of the Project.

21.     Additional impacts will include approximately 204.1 acres of wetlands within proposed transmission line rights-of-way, but the Corps has improperly failed to include the effect of the transmission lines in the PEDD, and apparently proposes to issue a separate permit for such effects. This constitutes an improper segmentation of the project.

### The National Environmental Policy Act

22.     In 1969, Congress, "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth…, resource exploitation … and new and expanding technological advances, and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," enacted NEPA, declaring it to be "the continuing policy of the Federal Government … to use all practical means and measures … to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans." (NEPA §101(a), 42 USC §4331(a)).

23.     NEPA is our basic national charter for protection of the environment.  It establishes policy, sets goals, and provides means for carrying out the policy.  Section 102(2) of NEPA contains "action-forcing" provisions to ensure that Federal agencies act according to the letter and spirit of the Act.  The President, the Federal agencies and the courts share responsibility for

enforcing the Act so as to achieve the substantive requirements and goals of the Act. 40 CFR

§1500.1(a)

24.     Among the goals set forth in §101(b) of NEPA are to:

a       fulfill the responsibilities of each generation as trustee of the environment for
        each successive generation;

b.      attain the widest range of beneficial uses of the environment without degradation,
        risk to health or safety, or other undesirable and unintended consequences;

c.      preserve important historic, cultural and natural aspects of our national heritage,
        and maintain wherever possible, an environment which supports diversity and
        variety of individual choice; and

d.      enhance the quality of renewable resources and approach the maximum attainable
        recycling of depletable resources.

25.     To achieve those goals and policies, NEPA requires that all agencies of the Federal

Government shall include in every recommendation for or report on major Federal actions

significantly affecting the quality of the human environment, a detailed statement by the

responsible official on:

(i)     the environmental impact of the proposed action,

(ii)    the adverse environmental effects which cannot be avoided should the proposal be
        implemented,

(iii)   alternatives to the proposed action,

(iv)    the relationship between local short-term uses of man's environment and the
        maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be
        involved in the proposed action should it be implemented.

(NEPA, §102(C), 42 USC §4332(C)).

### The CEQ Regulations

26.     Pursuant to NEPA and Executive Orders Nos. 11514 and 11991, the White House

Council on Environmental Quality ("CEQ") promulgated regulations implementing and

expounding upon the provisions of NEPA requiring that all Federal agencies prepare an

Environmental Assessment ("EA") and/or an Environmental Impact Statement ("EIS") to

determine the potential environmental effects of proposed Federal actions. Those regulations are

promulgated at 40 C.F.R. Part 1500 *et seq.* ("the CEQ Regulations")

27.     Under the CEQ regulations, the process of assessing the environmental impact of a

proposed Federal action is normally divided into three major steps (40 C.F.R. §1501.4):

    A.  Preparation of an environmental assessment ("EA"), which is defined as a "concise

        public document that serves to briefly provide sufficient evidence and analysis for

        determining whether the proposed Federal action may significantly affect the quality

        of the human environment; (40 CFR §1508.9). The preparation of an EA may be

        omitted if the agency decides that the proposed action merits preparation of an EIS.

        (40 CFR §1501.3, 1501.4).

    B.  If the EA determines that the proposed federal action will not significantly affect the

        environment, prepare a Finding of No Significant Impact ("FONSI"), which is

        defined as a document briefly presenting the reasons why an action will not have a

        significant effect on the human environment and for which an environmental impact

        statement therefore will not be prepared.  (40 CFR §1508.13)

    C.  If the agency determines that the proposed federal action may significantly affect the

        environment, commence the scoping process to prepare an EIS. (40 CFR §1501.4)

28.     In this case, the COE utilized a series of documents prepared by SWEPCO and its

consultants, including a "State-Level Arkansas Public Service Commission (APSC) EIS dated

April 19, 2007"; a "Supplement to the State-Level APSC EIS dated February 28, 2008," and SWEPCO's October, 2009 "Revised Update to the SEIS" to issue a 55-page single-spaced Environmental Assessment (the PEDD) concluding that the project will have no significant impact to the environment. By utilizing state-level environmental impact statements and issuing such a lengthy EA, the COE acknowledges that this permitting action may have "significant effect" on the human environment.

29.     Regulations promulgated by the CEQ address the issue of the scope of a NEPA analysis. Such regulations require that all reasonable and feasible alternatives to the proposed action be considered; that the direct, indirect and cumulative effects of a proposed action that may reasonably be anticipated be included in the EA or EIS; and prohibit the "segmentation" of various components of a planned action into smaller projects to avoid studying the cumulative impacts of the entire action or development. (40 CFR §§ 1508.25, 1508.27(b)(7))

### The Corps of Engineers Regulations

30.     NEPA also requires that each federal agency develop regulations designed to implement the requirements of NEPA in their activities (NEPA §103, 42 USC §4333), although the individual agency regulations supplement rather than replace the CEQ regulations, which remain applicable to all federal agency actions. (33 CFR §230.1)

31.     Pursuant to that requirement, the COE developed regulations contained at 33 CFR §§230 and 325. The COE regulations make clear that they are intended only to supplement the CEQ regulations contained at 40 C.F.R. Part 1500 through 1508, and that the COE regulations are intended to be used only in conjunction with the CEQ regulations. Whenever the COE regulations are unclear or not specific, the CEQ regulations apply. (33 C.F.R. §230.1)

### The CWA and Implementing Regulations for Permits Under Section 404

32.     The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." *Id.* § 1251(a)(2). Congress identified the national goal of eliminating "the discharge of pollutants into navigable waters" by 1985. *Id.* § 1251(a)(1).

33.     Under the Clean Water Act, it is illegal for anyone to discharge a pollutant into the waters of the United States without a permit. *Id.* § 1311(a). Dredged or fill materials are pollutants under the Clean Water Act. *Id.* § 1362(6).

34.     Clean Water Act Section 404, *Id.* § 1344, contains a specific exemption to this sweeping prohibition, authorizing the Secretary of the Army, Acting through the Corps of Engineers, to issue permits after notice and hearing to discharge "dredged or fill materials" into water of the United States, including wetlands. However, this authority may be exercised only if two negative presumptions are overcome, one against filling wetlands for any reason, 40 C.F.R. § 230.1(c), and the other against filling wetlands for an activity that is not water-dependent. *Id.* § 230.10(a)(3).

35.     Regulations promulgated by the U.S. Environmental Protection Agency pursuant to Section 404(b)(1), which are known as the "404(b)(1) Guidelines," define the COE's duty in evaluating individual permits under the CWA. According to the implementing regulations, "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these guidelines." *Id.* § 230.1(d). The 404 (b)(1) Guidelines are codified at 40 C.F.R. Part 230.

36.     Pursuant to the 404(b)(1) Guidelines, the COE is prohibited from issuing any permit if, among other requirements:

(1)     There is a practicable alternative to the proposed discharge that would have less

adverse effect on the aquatic ecosystem, so long as such alternative does not have

other significant adverse environmental consequences; or

(2)     The proposed discharge will result in significant degradation of the aquatic

ecosystem ... ; or

(3)     The proposed discharge does not include all appropriate and practicable measures

to minimize potential harm to the aquatic ecosystem; or

(4)     There does not exist sufficient information to make a reasonable judgment as to

whether the proposed discharge will comply with the Guidelines.

40 C.F.R. § 230.12(a)(3)

37.     The 404(b)(1) Guidelines mandate a sequential review process whereby the COE

evaluates individual permits. *See generally, Id.* § 320.5.

38.     Before issuing a permit, the COE must consider all available alternatives to the proposed

discharge, must determine that no practicable alternative exists that would have less adverse

impact on the aquatic environment, and must require that all appropriate and practicable steps to

avoid and minimize adverse impacts be taken. *See id.* § 230.10(a); *id.* § 230.91(c)(2).

39.     In undertaking this comprehensive analysis, the COE must first evaluate whether an

activity is water dependent. If a proposal is not water dependent, the COE must presume that

practicable alternatives exist that do not involve discharging into U.S. waters. *See, id.* §

230.10(a)(3).

40.     Although a particular alteration of a wetland may constitute a minor change, the

cumulative effect of numerous piecemeal changes can result in a major impairment of wetland

resources. Thus, the particular wetland site for which an application is made must be evaluated

with the recognition that it may be part of a complete and interrelated wetland area. 40 C.F.R. § 230.11(g) and 33 C.F.R. § 320.4.

41.     If the COE determines that no less damaging, practicable alternative to the proposed activity is available, the COE must then ensure that all appropriate and practicable steps will be taken to minimize adverse impacts of the discharge onto wetlands. 40 C.F.R. § 230.10(d).

42.     In order to ensure that adverse impacts have been reduced to the maximum extent, the COE must consider and regulate: actions concerning the material to be discharged, *id.* § 230.71; actions controlling the material after discharge, *id.* § 230.72; actions affecting the method of dispersion, *id.* § 230.73; actions related to technology, *id.* § 230.74; actions affecting plant and animal populations, *id.* § 230.75; actions affecting human use, *id.* § 230.76; and other actions related to filling *id.* § 230.77.

43.     Only after the avoidance and minimization criteria are satisfied can the COE even consider mitigation as a means of satisfying the 404(b) Guidelines. *Id.* § 230.91(c)(1)-(2).

44.     Before issuing a permit, 40 C.F.R. § 230.11 requires the COE to fully and independently determine in writing the potential short-term and long-term effects of a proposed discharge relating to:

      (a)     water circulation, fluctuation, salinity, and temperature;

      (b)     the substrate underlying and surrounding the aquatic environment, including the degree and impact of soil compaction;

      (c)     the kinds and concentrations of suspended particulate in the aquatic environment;

      (d)     the degree the fill material will impact the aquatic environment;

      (e)     the degree of impact on the aquatic ecosystem and organisms;

      (f)     the degree of cumulative effects on the aquatic environment; and

(g)     the degree of secondary effects on the aquatic environment.

45.     If, and only if, impacts to waters of the United States are unavoidable, the COE must determine whether compensatory mitigation is "capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity." *Id.* § 230.93(a)(1). The COE must consider, among other things, "the location of the compensation site relative to the impact site and their significance within the watershed." *Id.*

46.     One potential avenue of compensatory mitigation entails the purchase of mitigation credits from an approved mitigation bank. However, mitigation credits may not be purchased to offset unavoidable impacts when those impacts are not within the service area of the approved mitigation bank. *Id.* § 230.93(b)(4). Where purchase of mitigation credits is not available, the COE must require the prospective permittee to undertake its own compensatory mitigation measures using the principles of a watershed approach outlined in the regulations. *Id.*

47.     The requirements for permittee-responsible mitigation are detailed and rigorous. *Id.* § 230.93(c)-(o). In approving a prospective permittee's mitigation plan, the COE must take into account current trends in habitat loss or conversion; cumulative impacts of past development activities; current development trends; the presence and needs of sensitive species; site conditions that favor or hinder the success of compensatory mitigation projects; and chronic environmental problems such as flooding or poor water quality. The COE must consider:

    (1)     Hydrological conditions, soil characteristics, and other physical and chemical characteristics;

    (2)     Watershed-scale features, such as aquatic habitat diversity, habitat connectivity, and other landscape scale functions;

(3)    The size and location of the compensatory mitigation site relative to hydrologic sources (including the availability of water rights) and other ecological features;

(4)    Compatibility with adjacent land uses and watershed management plans;

(5)    Reasonably foreseeable effects the compensatory mitigation project will have on ecologically important aquatic or terrestrial resources (e.g., shallow sub-tidal habitat, mature forests), cultural sites, or habitat for federally- or state-listed threatened and endangered species; and

(6)    Other relevant factors including, but not limited to, development trends, anticipated land use changes, habitat status and trends, the relative locations of the impact and mitigation sites in the stream network, local or regional goals for the restoration or protection of particular habitat types or functions (e.g., re-establishment of habitat corridors or habitat for species of concern), water quality goals, floodplain management goals, and the relative potential for chemical contamination of the aquatic resources.

48.    For an individual permit that requires permittee-responsible mitigation, the COE must include special conditions that:

(1)    Identify the party responsible for providing the compensatory mitigation;

(2)    Incorporate, by reference, the final mitigation plan approved by the district engineer;

(3)    State the objectives, performance standards, and monitoring required for the compensatory mitigation project; and

(4)    Describe any required financial assurances or long-term management provisions for the compensatory mitigation project.

49.    For an individual permit that requires permittee-responsible mitigation, the COE must also include special conditions that require sufficient financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with applicable performance standards.

50.    The COE determinations and decisions related to the permit are not to take place behind closed doors. The COE must publish a public notice and allow for public comment before issuing an individual permit. 33 U.S.C. § 1344(a); 33 C.F.R. § 325.3; 40 C.F.R.§ 230.93.

51.    Under 33 C.F.R. § 325.3, "[t]he public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest. The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." Among many other items, the public notice should include the following: "A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area;" and "[a]ny other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest."

52.    Under 40 C.F.R. § 230.93, when the activity requires a Section 404 permit, the public notice for the proposed activity must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized and compensated for, including the proposed avoidance and minimization and the amount, type, and location of any proposed compensatory mitigation or indicate an intention to use an approved mitigation bank.

53.     Under 40 C.F.R. § 230.93(d)(1), "[c]opies of public notices will be sent to all parties who have specifically requested copies of public notices."

### The EPA Regulations for Permits under §404

54.     In 1980, the United States Environmental Protection Agency ("EPA"), in consultation with the Corps of Engineers, issued regulations setting out environmental criteria for issuing dredge and fill permits under §404 of the Clean Water Act, 33 U.S.C. §1344 ("the EPA Regulations"). These EPA Regulations, which were promulgated at 40 C.F.R. Part 230, are substantive rules, and no §404 Permit can be issued unless the requirements of the EPA Regulations have been satisfied.

55.     Under the EPA Regulations, all wetlands are deemed to be "special aquatic sites," subject to greater protection than other waters because of their "significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region." (40 C.F.R. §2309.3(q-1))

56.     The EPA Regulations require the evaluation of practicable alternatives to any proposal to fill a wetland, providing that:

> [N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. 40 C.F.R. §230.10(a)

57.     Regarding "practicable alternatives" to the proposed discharge, the Guidelines further provide that where the project is not "water dependent "(*i.e.*, the project must have access or proximity to water or the special aquatic site to fulfill its basic purpose, such as a wharf or harbor), a presumption exists that practicable alternatives are available that do not involve special aquatic sites, unless clearly demonstrated otherwise.  (40 C.F.R. §230.10(a)(3))

58.     Furthermore, the EPA Regulations also provide that a presumption exists that where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge that do not involve a discharge into a special aquatic site have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. *(Id.)*

59.     The EPA Regulations further provide that, "[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States," Effects contributing to significant degradation considered individually or collectively include:

(1)     Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife and special aquatic sites.

(2)     Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the disposal site through biological, physical and chemical processes;

(3)     Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability.  Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy. 40 C.F.R. §230.10(c).

60.     The COE violated the above and foregoing regulations in the issuance of the PEDD, and in issuance of the Permit.

### The Corps of Engineers Final Agency Action
### And The Administrative Procedure Act

61.     The COE's approval of the PEDD dated December 15, 2009, and issuance of the Permit

to SWEPCO on December 17, 2009, constitutes "final agency action" within the meaning of

sections 702 and 704 of the Administrative Procedure Act, 5 U.S.C. §§702, 704.

62.     The plaintiffs are "persons adversely affected or aggrieved" by the COE's action within

the meaning of §702 of the Administrative Procedure Act, 5 USC §702.  The plaintiffs are

conservationists, preservationists, and Citizens, or organizations whose members consist of such

individuals, concerned about the depletion of our natural resources, including wetlands. They are

also concerned about the effect of the Project on other areas of the human environment, such as

pollution of the air by greenhouse gas, sulfur dioxide, and mercury emissions from the plant; the

withdrawal of a large quantity of water from the Little River that will affect fish, wildlife,

habitat, wetlands and other areas dependent upon the normal flow of the Little River; the

significant increase of rail and road traffic and the hazards posed thereby in the immediate areas

where the plaintiffs reside; and increased hazards to public safety, noise, and lighting;

63.     The plaintiffs will be severely damaged and prejudiced by the implementation

of the Project, in that the Project would inflict total and irreparable damage and destruction to

and upon the project area's ecosystem; and adversely affect the ability of the plaintiffs and their

members to enjoy the natural environment of the area.

64.     In issuing the PEDD and the Permit to SWEPCO, the COE failed to comply with NEPA,

the CEQ regulations, the CWA, the COE regulations and the EPA Regulations, as hereinafter set

forth.  These actions were arbitrary, capricious, an abuse of discretion, and otherwise not in

accordance with law for the reasons alleged herein, and should be declared to be null and void.

65.    Unless enjoined, the proposed actions to be taken under the permit will severely and permanently adversely affect the quality of the human environment, and will cause irreparable injury to the Project area.  There is no other adequate remedy in a court other than that requested herein, and there is no other administrative redress or appeal provided by applicable law or regulations.

## *BASIS AND CLAIMS FOR RELIEF*

## COUNT I
## THE COE FAILED TO TIMELY INITIATE THE NEPA PROCESS

66.    The plaintiffs ratify, affirm and adopt all allegations contained in the preceding paragraphs.

67.    The goal of NEPA and its associated regulations is to assure that agencies proposing to take any action that will affect the natural environment will take a "hard look" at the environmental consequences. To make this "hard look" possible, Section 102(2)(C) of NEPA, 42 U.S.C. §4332(2)(C), requires each agency of the U.S. government, to the fullest extent possible, to "include in every recommendation or report on ***proposals*** for legislation or other major Federal actions significantly affecting the quality of the human environment, a detailed statement containing (i) the environmental impact of the proposed action; (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action;" and other factors to be considered by the agency. (Italics and bold added.) NEPA thus requires an agency to have prepared a final impact statement at the time at which it makes a recommendation or report on a proposal for federal action · not after the action has been commenced or completed.

68.     CEQ regulations require that "agencies shall integrate the NEPA process with other

planning "at the earliest possible time to insure that planning and decisions reflect environmental

values, to avoid delays later in the process, and to head off potential conflicts." (40 C.F.R.

1501.2)

69.     Pursuant to 40 C.F.R. §1502.5, "an agency shall commence preparation of an

environmental impact statement as close as possible to the time the agency is developing or is

presented with a proposal … . The statement shall be prepared early enough so that it can serve

practically as an important contribution to the decision-making process and will not be used to

justify decisions already made."

70.     Pursuant to 40 C.F.R. §1508.23, "a proposal exists at that stage in the development of an

action when an agency subject to the Act has a goal and is actively preparing to make a decision

on one or more alternative means of accomplishing that goal and the effects can be meaningfully

evaluated."

71.     For applications to the agency, appropriate environmental assessments or statements shall

be commenced no later than *immediately after the application is received.* 40 C.F.R. §1502.5(b),

(Italics added)

72.     The COE received an application for the Permit from SWEPCO prior to March 9, 2007,

but did not commence the preparation of an EIS at that time, in violation of the requirements of

NEPA and its implementing regulations described above. If it did commence the preparation or

review of an EIS at that time, the COE failed to notify the public and other interested parties of

such action.

73.     The COE authorized SWEPCO to commence construction on the plant on or before

December, 2007, without a permit having been issued.

74.     The COE failed to comply with the requirements of NEPA and its implementing regulations in failing to commence preparation of an EIS upon receipt of the application for the Permit from the applicant, SWEPCO. Such delay, coupled with the COE's action in allowing SWEPCO to commence construction on the plant prior to issuance of a permit, has prejudiced the NEPA decision-making process, and renders the Permit void.

## COUNT 2

### THE COE VIOLATED NEPA IN ALLOWING CONSTRUCTION ON THE PLANT TO COMMENCE WITHOUT A PERMIT

75.     The Plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

76.     The COE allowed the permittee, SWEPCO, to commence construction of the plant for which the Permit is sought on or before December, 2007.

77.     40 C.F.R. §1506.1(a) provides that until an agency issues a record of decision as provided in §1505.2, no action concerning the proposal shall be taken which would (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives. In addition, the COE was prohibited from allowing any work which would significantly affect the quality of the human environment during the development of an EIS or SEIS unless the work would not prejudice the ultimate decision on the program. Interim work pending a permit decision prejudices the ultimate decision when it tends to determine subsequent developments or limits alternatives.

78.     SWEPCO's action in commencement of construction had an adverse environmental impact in that SWEPCO filled regulatory wetlands on the site without a permit. Such action also

limited the choice of reasonable alternatives, in that the plant is now approximately 20 percent completed. Alternatives that would have been available prior to the commencement of construction are no longer available, including the no-action alternative. Work on the site by SWEPCO with the approval and consent of the COE will, therefore, prejudice the ultimate decision on the permit because it tends to determine subsequent developments and limit alternatives, as provided in 40 C.F.R. §1506.1.

79.     The permit issued by the COE to SWEPCO is tainted by the violations of NEPA and its implementing regulations as set forth above, and should be voided.

### COUNT 3.

### THE COE FAILED TO PREPARE OR ADEQUATELY SUPERVISE THE PREPARATION OF THE EIS

80.     The Plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

81.     40 C.F.R. §1506.5 (a) provides in relevant part that "The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers."

82.     Section 1506.5(c) further provides that, with certain exceptions not relevant here, any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by an contractor selected by the lead agency, or where appropriate under §1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest.

83.     In this case, the COE failed to comply with its responsibilities under 40 C.F.R. §1506.5,

in that the COE failed to (i) directly prepare the environmental impact statement; (ii) select and

retain a contractor to prepare the environmental impact statement; or (iii) independently evaluate

the information submitted by SWEPCO in support of SWEPCO's permit application. Instead, the

COE essentially treated SWEPCO's and its contractors' state-level EIS as satisfying the

requirements of a federal NEPA EIS. The COE did not independently evaluate the information

contained therein, or any other documents submitted by SWEPCO to the COE in support of the

permit application.

**COUNT 4**
**THE COE FAILED TO PROVIDE PLAINTIFFS WITH**
**AN OPPORTUNITY TO COMMENT ON KEY ENVIRONMENTAL DOCUMENTS**

84.     Plaintiffs adopt, ratify and affirm all allegations set forth in the preceding paragraphs.

85.     The COE issued three Public Notices regarding the filing of the application for the Permit

by SWEPCO. Those Public Notices were dated March 9, 2007, July 18, 2008, and August 21,

2009. Each of the Public Notices contained the same format, and each stated that the COE and

the Arkansas Department of Environmental Quality "are considering an application for a

Department of the Army Permit and State Water Quality Certification for the work described

herein."

86.     The Public Notices were in the nature of "scoping notices," inviting comments as to the

scope of a proposed environmental assessment (EA) or environmental impact statement (EIS).

Each Notice provided a general description of the project; general information relative to the

need for a state water quality permit, natural resources, endangered species, flood plain,

evaluation factors, public involvement (stating that the *purpose of the notice was to solicit*

*comments* from the public, Federal, state and local agencies, tribes and other interested parties

that would be used *to evaluate the impacts of the project*), an opportunity for a public hearing, and notification of final action.

87.    However, these Public Notices were not the functional equivalent of a draft EA or the SEIS that was ultimately relied upon by the COE as a basis for issuance of the COE's PEDD and the Permit. Those Notices included no environmental data regarding impacts of the project upon wildlife, cultural resources, watersheds, soils, fisheries and aquatics, and no discussion or analysis of direct, indirect and cumulative impacts.

88.    The plaintiffs Sierra Club, National Audubon Society and Audubon Arkansas received copies of the July 18, 2008, Public Notice from the COE, and submitted comments to the COE on August 6, 2008. Those plaintiffs also requested that the COE extend the time for submission of comments to allow for more comprehensive analysis of the information contained in the Public Notices, but the COE failed or refused to act upon such request. Because the information regarding the project, and its potential for affecting the human environment were very general, and included no references to environmental studies or assessments, those plaintiffs also requested in such comments the opportunity to review drafts of future reports.

89.    Additional persons also submitted comments to the COE pursuant to the March 9, 2007 and July 18, 2008 Public Notices. However, no persons submitted comments to the COE pursuant to the August 21, 2009 Public Notice because the COE failed to provide such Notice individually to persons who had submitted comments to the first two Public Notices. The COE advised these plaintiffs that the COE's failure to provide the plaintiffs with a copy of the August 21, 2009 Public Notice was "an oversight."

90.    40 C.F.R. §1503.1(a), regarding "Inviting Comments," provides that, "After preparing a draft environmental impact statement and before preparing a final environmental impact

statement, the agency shall: ... (4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected."

91.     Further, 40 C.F.R. §1501(b) provides that "An agency may request comments on a final environmental impact statement before the decision is finally made."

92.     In addition, 40 C.F.R. §1506.6 regarding "Public involvement," provides that agencies shall, among other things:

(a)     make diligent efforts to involve the public in preparing and implementing their NEPA procedures;

(b)     provide public notice of the availability of environmental documents so as to inform those person and agencies who may be interested or affected;

(c)     in all cases, mail notice to those who have requested it on an individual action;

(d)     make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the Freedom of Information Act, without regard to the exclusion for interagency memoranda, and without charge to the extent practicable.

93.     There were no references in any of the three Public Notices to any environmental impact statement, environmental assessment, alternatives analysis, wetlands analysis or other environmental documents prepared by the COE or SWEPCO or by their contractors pursuant to the requirements of NEPA or its implementing regulations. To the contrary, the wording of the Public Notices only stated that the COE was considering preparation of such documents, and was soliciting comments regarding the scope thereof. In addition, no such documents were provided or otherwise made available to the persons who commented in response to the Public Notices,

and no such documents were made available to the public on the COE Vicksburg District's
internet web site.

94.    The COE's PEDD dated and issued December 15, 2009, immediately prior to issuance of
the Permit, contains the following notation:

> Please note that this document references information found in the
> Applicant'state-level Arkansas Public Service Commission (ASPC)
> Environmental Impact Statement (EIS) dated 19 April 2007, and the Supplement
> to the state-level APSC Environmental Impact Statement (SEIS) dated 28
> February 2008, and SWEPCO's October, 2009 revised update to the SEIS, John
> W. Turk, Jr. Power Plant. The state-level APSC EIS and the APSC SEIS were
> prepared according to the laws of the State of Arkansas. Copies of the APSC EIS,
> the APSC SEIS, and the revised update to the SEIS documents are included in the
> regulatory project file.

95.    Based upon that notation, and other contents of the PEDD, it is apparent that the COE
based its PEDD and the Permit upon the EIS, SEIS and revised update to the SEIS (collectively
referred to herein as the "SEIS"). However, the COE at no time issued any notice to the public
that it was relying upon the SEIS; nor made any reference to those documents prior to issuance
of the PEDD; nor made those documents available to the public on a web site or through any
form of public notice.

96.    The COE's PEDD dated and issued December 15, 2009, quoted above, states that, in
approving the PEDD and issuing the Permit, the COE relied upon "SWEPCO's October, 2009
revised update to the SEIS." Based on its date of October, 2009, that document was not finalized
or issued until October, 2009, some three (3) months after the final August 21, 2009 Public
Notice. The deadline for comments stated in that Public Notice was September 10, 2009, and it
was impossible for members of the public to comment upon the revised update to the SEIS at
that time, as it had not been completed and issued.

97.     Further through documents obtained by plaintiffs from the COE subsequent to the issuance of the PEDD and the Permit, plaintiffs are aware and allege that the COE also based its PEDD and Permit upon a "Stream and Wetlands Mitigation Plan for Section 404 Impacts dated October, 2009," and a "Revised Alternatives Analysis dated October, 2009." As with the "October, 2009 revised update to the SEIS," the plaintiffs and other members of the public were unable to comment upon those documents pursuant to the final August 21, 2009 Public Notice, as they had not been completed and issued.

98.     The failure of the COE to provide or to make available to these plaintiffs and to other members of the public and other interested parties the EIS, SEIS and revised update to the SEIS, the "Stream and Wetlands Mitigation Plan for Section 404 Impacts dated October, 2009," the "Revised Alternatives Analysis dated October, 2009" and other documents upon which the COE's PEDD were based was a violation of NEPA and its implementing regulations in that the public and organizations interested in the proposed action did not have an opportunity to comment meaningfully upon the environmental documents upon which the PEDD and the Permit were based, or to allow such interested parties to request access to such documents pursuant to FOIA.

99.     Because of the failure of the COE to perform such duties, the plaintiffs were deprived of a meaningful opportunity to comment upon the environmental documents upon which the COE based its decision contained in the PEDD, which resulted in the issuance of the Permit. As a result, the NEPA-dictated process was not followed, and the Permit should be voided.

**COUNT 5**
**THE COE AFFIRMATIVELY MISREPRESENTED THE**
**STATUS OF THE NEPA PROCESS TO THE PLAINTIFFS,**
**THEREBY DEPRIVING PLAINTIFFS OF OPPORTUNITY TO**
**PARTICIPATE IN THE REVIEW OF DOCUMENTS**

100.    Plaintiffs adopt, ratify and affirm all allegations set forth in the preceding paragraphs.

101.    On July 23, 2009, counsel for the plaintiffs, Sierra Club, National Audubon Society and Audubon Arkansas sent an electronic mail memo to Ms. Karen A. Dove-Jackson, Project Manager of the COE for the SWEPCO Turk Plant Project, in which he stated that he had attempted to access information relative to the SWEPCO Turk Plant application on the Vicksburg District's web site, but had not been able to locate anything about it. He requested that, if information was available on the web site, he would like her to advise him where to look. He also requested that she advise him of the status of preparation of an environmental impact statement or environmental assessment for this permit.

102.    Ms. Dove-Jackson responded on the same date as follows: "We are not currently preparing an environmental assessment or environmental impact statement for the proposed project."

103.    Subsequently, on the same date, Ms. Dove-Jackson further responded to the plaintiffs' counsel as follows: "Mr. Mays, we will prepare an environmental assessment in compliance with the National Environmental Policy Act (NEPA) during the Section 404 permit process."

104.    Plaintiffs' counsel then responded to Ms. Dove-Jackson as follows: "Ms. Dove-Jackson: I received two emails from you. Just to make certain that I understand, the Corps is not currently preparing an EA or EIS, but it is planning on preparing an EA. If that is correct, can you tell me what the timetable is for commencement of the EA?"

105.    Ms. Dove-Jackson then replied as follows: "You are correct that an EA is not currently being prepared. I wanted to clarify in my second email that NEPA certainly will always be complied with during the 404 permit process. *That NEPA process has not been initiated and I can not give you a date certain as to when it will start.* Our normal

procedure is to initiate the NEPA process when it becomes appropriate during
permit processing and not set a fixed date." (Italics supplied)

106.   Notwithstanding the representation contained in Ms. Dove-Jackson's e-mail that "That
NEPA process has not been initiated," and that she could not provide a date certain on which it
would start, at the time that this exchange of e-mails occurred on July 23, 2009, the COE had
collaborated and consulted with SWEPCO in regard to the collection of environmental
documents that SWEPCO had prepared, was in possession of the environmental documents upon
which the COE's PEDD and Permit were based, had initiated the NEPA process, and was in the
process of developing the PEDD and the Permit that it would issue in December, 2009.

107.   The misrepresentations of the COE, acting through its Project Manager, Karen Dove-
Jackson, to the plaintiffs regarding the status of the NEPA process on SWEPCO's application for
the Permit, deprived the plaintiffs of an opportunity to submit meaningful comments to the COE
on the environmental documents that were already in the COE's possession, or that came into the
COE's possession soon thereafter.

108.   Further, the content of the plaintiffs' initial comments to the COE in response to Public
Notice of July 18, 2008, coupled with the e-mail communication from plaintiffs' counsel
described above, served notice upon the COE that plaintiffs were parties who were interested in
the NEPA process regarding the Permit application of SWEPCO, and wanted to receive copies
of further notices and environmental documents issued by or being reviewed by the COE.

109.   Because of the COE's misrepresentations to the plaintiffs regarding the status of the
NEPA process on SWEPCO's application for the Permit, and the COE's failure to provide
environmental documents, reports and notices to the plaintiffs as required by 40 C.F.R. §1506.6,
the plaintiffs were deprived of a meaningful opportunity to comment upon the environmental

documents that were submitted by SWEPCO to the COE in support of the application. Consequently, NEPA and its implementing regulations have been violated frustrated and circumvented, and the Permit issued by the COE to SWEPCO should be voided and set aside, and this matter remanded to the COE for reconsideration of the Permit Application and compliance with NEPA and its implementing regulations.

**COUNT 6.**

**THE PEDD IS INVALID BECAUSE IT IS BASED ON A
REVISED SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT
THAT FAILS TO MEET NEPA STANDARDS**

110.    Plaintiffs adopt, ratify and affirm all allegations set forth in the preceding paragraphs.

111.    The PEDD references information "found in the Applicant's state-level Arkansas Public Service Commission (ASPC) Environmental Impact Statement (EIS) dated 19 April 2007, and the Supplement to the state-level APSC Environmental Impact Statement (SEIS) dated 28 February 2008, and SWEPCO's October, 2009 revised update to the SEIS, John W. Turk, Jr. Power Plant." The PEDD further states that "the state-level APSC EIS and the APSC SEIS were prepared according to the laws of the State of Arkansas." However, there is no certification or statement in the PEDD that those documents meet the requirements of NEPA and its implementing regulations. In fact, they do not.

112.    Based upon the review that the plaintiffs have been able to conduct of documents that they have obtained and reviewed subsequent to the issuance of the PEDD and the Permit, the plaintiffs assert that the SEIS fails to meet NEPA standards in the particulars and respects set forth below, among others. Plaintiffs reserve the opportunity to supplement and amend these objections to the SEIS and other environmental documents relied upon by the COE in issuance

of the PEDD and the Permit following the COE's filing of the Administrative Record in this

proceeding.

## A. *The SEIS Does Not Adequately Analyze A "No-Action" Alternative*

113.    40 CFR §1502.14 states that the in-depth analysis and discussion of reasonable

alternatives is considered the heart of the detailed statement.   The failure to provide a detailed

analysis on all reasonable alternatives is fatal to any permit based on the PEDD.

114.    40 C.F.R. §1502.14, regarding Alternatives, provides, inter alia, as follows:

> The [Environmental Impact Statement] should present the environmental impacts of
> the proposal and the alternatives in comparative form, thus sharply defining the issues
> and providing a clear basis for choice among options by the decision maker and the
> public. In this section agencies shall:
>
> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for
> alternatives which were eliminated from detailed study, briefly discuss the
> reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the
> proposed action so that reviewers may evaluate their comparative merits;
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency;
>
> (d) Include the alternative of no action.

115.    The Council on Environmental Quality has issued guidance on NEPA's requirements

entitled "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations," (herein, "40 Questions"), 46 Fed. Reg. 18026 (Mar. 23, 1981), as amended by 51

Fed. Reg. 15618 (Apr. 25, 1986). While such guidance does not constitute regulation, courts

have held that the guidance document is entitled to deference.

116.    In 40 Questions, the CEQ addressed in Question No. 3 the issue of what constitutes the

"No Action" alternative. With regard to the type of agency action involved in this case (i.e.,

issuance of a permit), the CEQ stated:

The second interpretation of "no action"is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequences of the "no action" alternative.

. . .

This analysis provides a benchmark, enabling decision makers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c).

46 Fed. Reg. at 18027 (3/23/1981)

117.    The "state level SEIS" reviewed and relied upon by the COE in issuance of its PEDD and

the Permit simply states in its "no action" alternative analysis that, if the Turk Project does not

occur, the plant will not be built and electricity will not be generated by such plant.

118.    The "no action" alternative contained in the "state-level SEIS" prepared by SWEPCO

and relied upon by the COE (but not issued by the COE as available for public review and

comment) does not "rigorously explore and objectively evaluate" that alternative, and does not

devote substantial treatment to nor consider in detail that alternative as required by 40 C.F.R.

§1502.14.

119.    The "no action" alternative contained in the "state-level SEIS" prepared by SWEPCO

and relied upon by the COE (but not issued by the COE as available for public review and

comment) does not compare the resulting environmental effects from taking no action with the

effects of permitting the proposed activity or an alternative activity to go forward, nor does it

analyze the predictable actions by others in the event that a "no action" alternative be chosen, as

required by CEQ's guidance in 40 Questions. Included in such an analysis should be the

feasibility for SWEPCO purchasing electricity from an existing gas-fired electrical generating plant located in Union County, Arkansas which is operating at only partial capacity.

120.    The reliance of the COE on the inadequate "state-level SEIS" prepared by SWEPCO and its contractors and consultants, and the COE's failure to prepare its own "no action" alternative analysis, is a violation of NEPA and its implementing regulations that renders the PEDD and the Permit invalid. This matter should be remanded to the COE for further analysis of the application and further environmental assessment.

### B.    The Alternative Sites Analysis Was Not Made Available
### For Public Analysis and Comment

121.    SWEPCO and its contractors and consultants prepared a Revised Alternatives Analysis for the Turk Plant dated October, 2009. That document, which purports to contain a comparative analysis of the suitability of the Turk Site and eight alternative sites, is dated subsequent to the COE's August 21, 2009 Public Notice. Like the SEIS, the COE did not make the Revised Alternatives Analysis available to the public and other interested parties, including these plaintiffs for review and comment.

122.    The Alternatives Analysis was filed in a proceeding for a Certificate of Environmental Compatibility and Public Need before the Arkansas Public Service Commission, but such Analysis was claimed to be confidential by SWEPCO, and placed under seal during the PSC proceedings.

123.    As noted above, 40 CFR §1502.14 states that the in-depth analysis and discussion of reasonable alternatives is considered the heart of the detailed statement. Pursuant to 40 C.F.R. §1503.1, the COE had an obligation to make the Revised Alternatives Analysis available to the public and other interested parties for review.

124.     The failure of the COE to make the Revised Alternatives Analysis available to the public and other interested parties, including the plaintiffs, for review and comment is fatal to the validity of the PEDD and the Permit.

125.     Further, in their Alternatives Analysis, in the Revised Alternatives Analysis, and in the PEDD, the Developer and COE did not clearly demonstrate that practicable alternatives are not available, and have not rebutted the presumption that there are other available sites that will have less adverse impact on the aquatic ecosystem.  1269.          Practicable alternative locations are available for the Project that would not involve discharges into special aquatic sites or that would have less adverse impact on the aquatic ecosystem.

127.     The failure of the COE and SWEPCO to overcome the presumptions regarding the availability of practicable alternatives and to otherwise properly analyze all reasonable and feasible alternatives that would not impact the quantity of wetlands at the Turk Plant site renders the PEDD and the Permit invalid.

### C.     The Stream and Wetland Mitigation Plan Was Not Made Available For Public Analysis and Comment

128.     40 C.F.R. §1502.14 (Alternatives) provides that, in the analysis of alternatives, the COE or the applicant shall, among other things, include appropriate mitigation measures not already included in the proposed action or alternatives. (§1502.14(f)). 40 C.F.R. §1502.16 also requires that the EIS include a discussion of means to mitigate adverse environmental impacts.

129.     SWEPCO and its contractors and consultants prepared a Stream and Wetlands Mitigation Plan for the Turk Plant dated October, 2009. That document, which purports to discuss the impacts of the Turk Project on wetlands and streams located on or abutting the Project site, and the proposed mitigation for such impacts, is dated subsequent to the COE's August 21, 2009

Public Notice. Like the SEIS, the COE did not make the Revised Alternatives Analysis available to the public and other interested parties, including these plaintiffs for review and comment.

130. The COE had an obligation and duty to make the Alternatives Analysis and the Stream and Wetlands Mitigation Plan available to the public and other interested parties, including these plaintiffs. The failure of the COE to make the Stream and Wetlands Mitigation Plan available to the public and other interested parties, including the plaintiffs, for review and comment is fatal to the validity of the PEDD and the Permit.

## C. *The Analysis of Direct Impacts of the Plant On The Human Environment Does Not Comply With NEPA Standards*

131. Regulations promulgated by the CEQ at 40 CFR §1502.16 provide that, to support the requirements of Section 102(2)(C) of NEPA, a detailed statement on environmental impacts of a proposed action should include a discussion of the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. The discussion must include:

(a) Direct effects of the proposed action and their significance. 40 CFR §1502.16(a) "Direct effects" are caused by the action, and occur at the same time and place. 40 CFR §1508.8(a)

(b) Indirect effects of the proposed action and their significance. 40 CFR §1502.16(b) "Indirect effects" are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. "Indirect effects" may include growth inducing effects and other effects related to induced

> changes in the pattern of land use, population density or growth rate, and related
> effects on air and water and other natural systems, including ecosystems. 40 CFR
> §1508.8(b)

132.    In preparation of the PEDD and its underlying and preceding documents, SWEPCO and

COE failed to adequately consider and discuss the direct and indirect environmental effects of all

of the proposed action and its components on the immediate area in which the Turk Plant is

located, the State of Arkansas, and the global environment. The inadequacies of the PEDD

include, but are not limited to, the following:

### (I)        The Analysis of the Direct or Indirect Impacts of Fuels That Could Be Used At The Plant Was Inadequate.

133.    The "state-level SEIS" states that coal from the Powder River Basin is anticipated to be

the primary fuel source at the Turk Plant, and that the Plant is designed to burn 9,000 tons of coal

per day, or 3,285,000 tons of coal per year; and that the Turk Plant will have a useful life of

between 30 and 50 years. However, that SEIS fails to conduct a meaningful analysis of the direct

impacts of the use of such fuel source on the human environment.

134.    The SEIS also provides that substantial quantities of carbon dioxide ($CO_2$), sulfur

dioxide ($SO_2$), lead, mercury and other contaminants will be emitted into the atmosphere as a

result of the operation of the Plant.

135.    According to the SEIS, the Plant will emit 5,280,000 tons of $CO_2$ per year. $CO_2$ has been

recognized by the United States Supreme Court as a major cause of the greenhouse gases that

contribute to climate change (see *Massachusetts et al v. Environmental Protection Agency*, 549

U.S. 497, 127 S.Ct. 1438 (2007)), and that Court has ordered the U.S. EPA to promulgate

regulations limiting emissions of $CO_2$ by pollution sources such as the Turk Plant.

136.    Mercury is a highly-toxic contaminant that bioaccumulates in organisms in the

environment and makes it way up the food chain to humans who consume fish and wildlife that

have ingested mercury. A number of Arkansas' water bodies are currently impacted and

impaired by high levels of mercury, some to the extent that advisories have been issued by state

and Federal regulatory agencies warning the public against the consumption of fish and wildlife

taken from such waters.

137.    Notwithstanding the potential environmental significance of the emissions of large

amounts of $CO_2$, mercury and other contaminants into the environment, there is no attempt in

the state-level SEIS to analyze the direct or indirect effects of the emission of those contaminants

from the Turk Plant upon such environment, other than in the immediate area of the Plant, and

then only in a superficial manner.

138.    Further, the state-level EIS also provides that other materials may be used to fuel the

Turk Plant as an alternative to Powder River Basin coal, including coals from other sources and

lignite that are known to emit substantially higher quantities of $CO_2$, sulfur, mercury and other

contaminants.

139.    While the state-level EIS states that the use of such alternative fuels is a possibility, it

does not provide the volume of contaminants that may be emitted as a result of the use of such

fuels, or analyze the direct, indirect or cumulate impacts from the use of such alternative fuels.

The failure of the COE to analyze, or to require an analysis by SWEPCO, of the direct, indirect

or cumulative impacts of the foreseeable use of such alternative fuels is a violation of the

requirements of NEPA and its implementing regulations.

140.    Further, there are other technologies mentioned in the state-level SEIS that SWEPCO has

elected not to use to reduce emissions, and that were not analyzed as options or alternatives in

the SEIS. Among those are a technology referred to as Integrated Gasification Combined Cycle ("IGCC") technology that, if used, would substantially reduce emissions from the Plant. The U.S. EPA has questioned the failure to consider use of that technology in the permit issued by the Arkansas Department of Environmental Quality to SWEPCO under the Clean Air Act.

141.    Also not analyzed in the state-level SEIS is the technology of "carbon capture," in which $CO_2$ emissions are captured and transmitted into underground storage. SWEPCO claims to be utilizing carbon capture technology at other facilities at the current time, but has failed to do so at the Turk Plant. An analysis of the alternative, and the environmental impacts of the use of such technology at the Turk Plant should be made by the COE and SWEPCO.

142.    This matter should be remanded to the COE with instructions to conduct further analysis on the direct and indirect effects of the emissions of contaminants from the Turk Plant upon the environment, not only of the immediate area in the vicinity of the Plant, but also of the State of Arkansas, the nation and the Earth.

### II.    There Is No Analysis Of The Cumulative Impacts Of Of The Turk Plant Operations In The State-Level SEIS

143.    NEPA and its implementing regulations impose upon an agency proposing a major federal action the duty to discuss cumulative impacts in an EIS. "Cumulative impacts" are the impact on the environment that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. (40 C.F.R. §1508.7)

144.    Based upon 40 C.F.R. §1508.7, it is the duty of the Corps to assess and evaluate in the detailed statement the incremental impact of the Project with any other past, present or

reasonably foreseeable future actions, regardless of whether such actions have been, are being, or will be taken by a governmental agency or a private person, organization or entity. No such assessment has occurred in the state-level SEIS or in the PEDD, and consequently the PEDD and the Permit are invalid.

145.    The SEIS fails to discuss efforts by SWEPCO, its contractors or consultants, or the COE to determine what other past, present or reasonably foreseeable future actions have been, are being or will foreseeably be taken by any governmental entity, or any private person, organization or entity, so as to determine the cumulative impacts of those actions with the one being permitted. Instead, the SEIS simply provides that, aside from a few local changes in roads, there were no identifiable cumulative impacts of the Turk Plant. The COE is obligated to conduct a search or investigation for such other actions on a scale that is compatible with the emissions from the Turk Plant.

146.    Other present or reasonably foreseeable future actions include the permitting of impacts upon wetlands in southwest Arkansas required for the construction of transmission lines leading from the Turk Plant to connect with electrical grids. In addition, the SEIS states that the Turk Plant is designed for the subsequent addition of a second 600 megawatt power unit to meet future demands for electricity. The addition of such second power unit is, consequently, "reasonably foreseeable," and the direct, indirect and cumulative impacts of the addition of that second power unit should be analyzed.

147.    Further, the "other past, present or reasonably foreseeable future actions have been, are being or will foreseeably be taken by any governmental entity, or any private person, organization or entity" that should be identified and analyzed to determine the cumulative impacts of those actions with the impact of the Turk Plant should be viewed on a basis other than

merely local impacts. It is now widely recognized that the impact of air emissions on global

warming is "unquestionably subject to NEPA's cumulative impacts requirements." *Center for*

*Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir.

2008)(citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)).Large power plants such as the Turk

Plant have wide regional, national and global impacts, and the cumulative impacts of the Turk

Plant should be analyzed in such a perspective. This should require the COE to assess the

cumulative impact of the Turk Plant with other coal-fired electrical generating plants, and with

other sources of emissions of CO2 and the other contaminants to be emitted by the Turk Plant.

148.    This matter should be remanded to the COE with instructions to identify other past,

present or reasonably foreseeable future actions that have been, are being or will foreseeably be

taken by any governmental entity, or any private person, organization or entity, and to conduct

further analysis on the cumulative effects of those actions with the emissions of contaminants

from the Turk Plant upon the environment, not only of the immediate area in the vicinity of the

Plant, but also of the State of Arkansas, the nation and the Earth.

## COUNT 7.

## THE COE IS IMPROPERLY "SEGMENTING" THE PROJECT
## TO AVOID DETERMINATION OF GREATER ENVIRONMENTAL IMPACT

149.    The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

150.    "Segmentation" occurs when an agency attempts to separate one or more components of

a proposed action for study in order to avoid the greater impacts that the combined actions would

cause. Under 40 CFR §1508.25, agencies are required to consider:

> (a)    Actions (other than unconnected single actions) which may be:

>> (1)    Connected actions, which means that they are closely related and
>> therefore should be discussed in the same impact statements.
> Actions are connected if they:

      i. Automatically trigger other actions which may require environmental impact statements.

      ii. Cannot or will not proceed unless other actions are taken previously or simultaneously.

      iii. Are interdependent parts of a larger action and depend on the larger action for their justification.

151.    Under 40 C.F.R. §1508.27(b)(7), the significance of an impact on the environment cannot be avoided by breaking it down into small component parts, i.e., by "segmentation."

152.    The construction of high-voltage transmission lines are an indispensable adjunct to the construction of an electrical generating plant such as the Turk Plant. The generation of electricity from the Turk Plant cannot or will not proceed unless other actions are taken previously or simultaneously to construct transmission lines and connect them to the Plant and to electrical distribution stations. Transmissions lines are interdependent parts of a larger action and depend on the larger action for their justification.

153.    The COE has recognized this fact in its three Public Notices described above. In those Public Notices, the COE initially purported to permit the Turk Plant Site and the transmission lines in a single permitting process.

154.    However, in issuance of the PEDD and the Permit, the COE did not purport to include the impact upon wetlands regulated by the COE in its environmental analysis, or in the Permit. Instead, the COE purports to address the environmental impacts to wetlands as a result of the construction of transmission lines in a separate PEDD and Permit.

155.    By doing so, the COE is improperly segmenting the NEPA analysis and permitting of the Turk Plant from that of the wetlands affected by the construction of transmission lines, in

violation of the CEQ Regulations set forth above. Such segmentation voids the PEDD and the Permit issued pursuant to the PEDD.

156.    The PEDD and the Permit should be declared void by this Court, and remanded to the COE for further proceedings in accordance with the requirements of NEPA and its implementing regulations.

## COUNT 8.

### THE COE VIOLATED THE NOTICE AND COMMENT REQUIREMENTS OF SECTION 404

157.    The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

158.    The COE failed to provide a copy of the August 21, 2009 Public Notice to the plaintiffs despite the fact that the plaintiffs specifically requested copies of public notices and other relevant documents and reports. This failure violated 40 C.F. R. §2 30.93(d)(1), prejudiced plaintiffs' ability to participate in the permitting process, and invalidates the findings of the PEDD and the Permit.

159.    The Public Notices issued by the COE were deficient in that:

      (i)      The Notices failed to include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comments.

      (ii)     The documentation attached to the Notices concentrated overwhelmingly on the impacts associated with transmission lines that were not addressed or authorized in the Permit.

      (iii)    The Notices did not contain a plan and elevation drawings showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterways and depth of water in the area.

(iv)    With the exception of the August 21, 2009 notice that was not supplied to Plaintiffs, the Notices did not contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized and compensated for, including the proposed avoidance and minimization, and the amount, type and location of any proposed compensatory mitigation, or indicate an intention to use an approved mitigation bank.

These deficiencies violated 33 C.F.R. §325.3 and 40 C.F.R. §230.93, prejudiced plaintiffs' ability to participate in the permitting process, and invalidated the findings of the PEDD and the Permit.

160.    The COE failed to provide access to the documentation it was considering during the permitting process. The COE adopted verbatim and improperly incorporated by reference into the PEDD, documents that were unavailable to the public and documents that were generated after the close of the last comment period, including the Revised Update to the State-Level SEIS dated October, 2009, the Stream and Wetland Mitigation Plan for Section 404 Impacts dated October, 2009, and the Revised Alternatives Analysis dated October, 2009. These documents were clearly central to the COE's decision-making. The failure to allow public access to these documents before making a decision violated 33 C.F.R. §325.3 and 40 C.F.R. §230.93, prejudiced plaintiffs' ability to participate in the permitting process, and invalidated the findings of the PEDD and the Permit.

## COUNT 9.

### THE COE'S APPROVAL OF ON-SITE MITIGATION MEASURES VIOLATED THE SUBSTANTIVE REQUIREMENTS OF SECTION 404

161.    The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

162.    The COE improperly approved permittee-responsible mitigation measures without considering the appropriate factors mandated by 40 C.F.R. §230.93. The administrative record is devoid of any consideration of the structure, function or characteristics of the impacted streams, wetlands or watershed. The COE could not reasonably conclude that mitigation will offset the loss because it does not know what will be lost.

163.    The COE approved vague mitigation measures for significant adverse impacts to riparian and stream habitat with absolutely no basis or analysis. The entirety of the COE's determination regarding these mitigation measures is as follows:

> The applicant has agreed to fulfill onsite stream relocation, creation and enhancement of 485 linear feet of Bridge Creek and 5,599 linear feet of intermittent tributaries to Bridge Creek.

Absolutely no detail is provided to allow the COE or the public to determine the adequacy, or even the practical meaning, of these proposed mitigation measures. The effectiveness of stream relocation, creation, and enhancement as a mitigation measure is a matter of scientific controversy. The administrative record is devoid of any evidence upon which the COE could reasonably base a finding that adverse impacts from filling over 6,000 feet of streams will be mitigated.

164.    The COE improperly failed to include required special conditions related to mitigation measures in the permit, including, without limitation, the following:

    a.    The Permit does not identify the party responsible for providing on-site mitigation.

    b.    The final mitigation plan approved by the district engineer and incorporated into the permit lacks any specificity and is unenforceable.;

  c.  The Permit does not state the objective performance standards and monitoring

     requirements for compensatory mitigation projects;

  d.  The Permit does not require financial assurance sufficient to ensure a high level of

     confidence in the successful completion of the mitigation measures.

The failure to include these special conditions violates 40 C.F.R. §230.93(k) and (n).

<b>COUNT 10.</b>

<b>THE COE'S APPROVAL OF OFF-SITE MITIGATION MEASURES
VIOLATES THE SUBSTANTIVE REQUIREMENTS OF SECTION 404.</b>

165. The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

166. The COE improperly treated the purchase of mitigation credits from Camp Nine

Mitigation Bank in Chicot County, Arkansas, and Lower Cutoff Mitigation Bank in Drew

County, Arkansas, as valid offsets for unavoidable adverse impacts.

167. The adverse impacts of the project will occur primarily in Hempstead, Miller and Little

River Counties, Arkansas, and Bowie County, Texas. The Arkansas counties are located within

the Coastal Plain Planning Region mitigation bank service area delineated by the Arkansas

Natural Resources Commission. Bowie County, Texas is obviously located outside of the State

of Arkansas.

168. The authorized mitigation bank service area of the Camp Nine Mitigation Bank and

Lower Cutoff Mitigation Bank is the Delta Planning Region as delineated by the Arkansas

Natural Resources Commission.

169. The COE improperly allowed the purchase of mitigation credits outside the Coastal Plain

Planning Region Mitigation bank service area to offset impacts within that service area in

violation of 40 C.F.R. §230.93(a)(1).

## COUNT 11.

### THE COE DETERMINATIONS REGARDING SECONDARY
### AND CUMULATIVE IMPACTS ARE UNSUPPORTED BY
### THE RECORD AND ARE ARBITRARY AND CAPRICIOUS

170.    The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

171.    The COE failed to conduct an independent analysis of secondary and cumulative impacts,

but rather adopted verbatim the applicant's vague and self-serving Revised State-Level SEIS,

which was not made available to the public for review and comment. The COE bases its

determination that secondary and cumulative impacts are inconsequential on conclusory

statements by the applicant. The record is devoid of any support that could provide a rational

basis for the COE determinations.

172.    By way of example, and not limitation, the applicant notes certain direct impacts of the

project, but fails to quantify them or to state indirect or cumulative impacts as follows:

        a.      The applicant states that there will be direct impacts in the form of the addition of

hundreds of new jobs and an unprecedented economic activity in the area, but the secondary and

cumulative impacts from this unprecedented growth on adjacent wetlands are not stated, nor are

any other negative "growth factors" on the area.

        b.      The applicant notes past activities related to lumber operations, agricultural

activities, and nearby housing construction, but the cumulative impact of the facility construction

and operation following these concurrent uses is not stated.

        c.      The applicant notes a direct impact in the form of excavating and moving 450,000

cubic yards of earth to raise and level the ground for plant facility construction, but apart from

erosion, secondary and cumulative impacts on adjacent wetlands from grading the site are not

stated;

d.      The applicant notes a direct impact in the form of the emission of nitrogen oxide, sulfur dioxide, mercury, and particulates. Secondary and cumulative impacts on adjacent wetlands from these emissions are not stated; The referenced "analysis and modeling of potential impacts of these air emissions" are not provided.

e.      The applicant notes a direct impact in the form of destruction and rerouting of 8,150 linear feet of streams, but the cumulative and secondary impacts on adjacent wetlands from destroying these streams are not stated.

f.      The applicant notes a direct impact in the form of withdrawal of 6,500 gallons per minute (9,360,000 gallons per day) from the Little River, which is more than ten percent (10%) of the volume of that River, but secondary and cumulative impacts on adjacent wetlands from withdrawing that volume of water are not stated.

g.      The applicant notes vaguely that there will be direct impacts in the form of wildlife habitat destroyed, birds killed, increased noise, and degradation of esthetic values of nearby parks and recreational areas, but no secondary or cumulative impacts that follow from these direct impacts are stated.

146.    In addition to violating NEPA and its relevant regulations, the failure of the COE to analyze cumulative and secondary impacts violates 40 C.F.R. §230.11(g) and 33 C.F.R. §320.4.

## COUNT 12.

### THE COE'S DETERMINATIONS REGARDING PRACTICABLE ALTERNATIVES ARE DEVOID OF INDEPENDENT ANALYSIS OR SUPPORTING EVIDENCE

173.    The plaintiffs ratify, affirm and adopt all allegations set forth in the preceding paragraphs.

174.    The COE correctly finds that the project is not water dependent and correctly states that a presumption exists that practicable alternatives exist that could meet the project purpose that are

less damaging to the aquatic ecosystem. However, the COE failed to apply that presumption to the Permit Application.

175.    The COE failed to conduct an independent analysis of potential alternative sites, instead adopting verbatim the Applicant's vague and self-serving analysis generated in state-level utility regulation proceedings. The record contains no evidence that could overcome the presumption that less damaging alternatives are practicable.

176.    By way of example, and not limitation, the Applicant identifies a site in Miller County, Arkansas, that meets all the requirements of the facility and would only impact 1.5 acres of wetlands. However, the Applicant concludes that the site is not practicable because it would involve trucking fill material from offsite at a cost of twelve million dollars. The record, insofar as is known to plaintiffs, contains no support for the factual assertions of the applicant. Assuming that the facts are correct (which is completely contrary to the presumption that practicable alternatives exist), the record contains no indication why twelve million dollars is cost-prohibitive in a project of this size. The record contains no indication whether that cost would be offset by other savings, for example, not having to relocate and rehabilitate over 6,000 linear feet of streams on-site. Despite the absence of support to rebut the presumption that practicable alternatives exist, the COE adopts the Applicant's conclusions without question.

177.    The COE failed to conduct any analysis at all of alternative project designs. Instead of a design analysis, the COE states without support or explanation: "The basic purpose of the project, to construct a 600-MW steam-electric power plant, requires a specific project design." This statement, standing on its own without evidentiary support, cannot rebut the presumption that practicable design alternatives exist.

178.   The COE's failure to undertake a reasonable alternatives analysis violates 40 C.F.R. §§230.10(a) and 230.91(c)(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, Sierra Club, Audubon Arkansas, Charles Mills and Granville Parnell, respectfully pray for an Order:

1.   Declaring the PEDD issued by the COE dated December 15, 2009, and the Permit No. MVK-2006-1903 issued by the COE to SWEPCO dated December 17, 2009, to be null and void, and of no effect;

2.   Granting preliminary and permanent injunctions against the COE and the individual defendant, Col. , Jeffrey R. Eckstein, District Engineer of the Vicksburg District of the U.S. Army Corps of Engineers, or his successor or subordinates, from implementing or allowing the implementation by SWEPCO of the dredge and fill activities contained in the Permit;

3.   Requiring the COE to revoke the Permit issued to SWEPCO for dredge and fill activities on the Turk Power Plant Site under Section 404 of the Clean Water Act;

4.   Preliminarily and permanently enjoining the Defendants from taking any action on any new permit application for this project until they have analyzed the entire proposed development pursuant to NEPA and the Clean Water Act;

5.   Compelling the COE and the individual defendant, Col. Eckstein, or his successor, to prepare any future environmental documentation regarding the proposed Project in accordance with the requirements of NEPA, the CEQ regulations, the COE regulations, the EPA Guidelines, the Clean Water Act and its implementing regulations, and all other applicable laws, regulations and policies;

6.     Ordering the defendants to direct SWEPCO to immediately halt further construction of the plant, and any activities on the Project site that would disturb the status quo thereon.

7.     Awarding plaintiffs their costs of litigation, including but not limited to, attorneys' fees, consultants' and expert witness fees, and costs as permitted by 28 U.S.C. §2412 and Rule 54(d), Federal Rules of Civil Procedure; and

8.     Awarding such other legal, equitable and proper relief as may be just and proper.

Respectfully submitted,

MAYS & WHITE PLLC

By: _____

     Richard H. Mays (AR Bar # 61043)
     115 South Third Street -- Suite 2
     P.O. Box 1450
     Heber Springs, AR 72543
     (501) 362-0055
     (501) 362-0055
     e-mail: rhmays@mayswhite.com

And

Robert Wiygul, Esq.
Clay Garside, Esq.
WALTZER & ASSOCIATES
14399 Chef Menteur Highway, Suite D
New Orleans, LA 70129
Tel: (504) 254-4400
Fax: (504) 254-1112