THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, NATIONAL AUDUBON SOCIETY, and AUDUBON ARKANSAS, | ) ) ) ) | 4:10CV4017 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| UNITED STATES ARMY CORPS OF ENGINEERS, COLONEL JEFFREY R. ECKSTEIN, District Engineer, Vicksburg District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| vs. | ) ) | |
| SOUTHWEST ELECTRIC POWER COMPANY, | ) ) ) | |
| Intervenor. | ) | |

    The Sierra Club, the National Audubon Society, Audubon Arkansas, and two individuals brought this lawsuit against the United States Army Corps of Engineers requesting declaratory and injunctive relief for the Corps' failure to comply with federal and state laws in issuing a Clean Water Act permit (the "§ 404 permit") to intervening defendant Southwest Electric Power Company ("SWEPCO"), which planned to build the John W. Turk, Jr., power plant in Arkansas.[1]

---

[1]The Amended Complaint describes the power plant's location as "in Hempstead, Miller and Little River Counties, Arkansas, near the confluence of the Little River and the Red River near Fulton, Arkansas." (Filing 66 ¶ 4.)

After reaching a settlement with the defendants, individual plaintiffs Yancey Reynolds and Charles Mills were dismissed from this action on August 22, 2011. (Filing 200.) Thereafter, SWEPCO filed motions to dismiss this matter for lack of standing (filing 201) and mootness (filing 203).

SWEPCO's motions assert that this matter must be dismissed for lack of jurisdiction because: (1) the individual plaintiffs' dismissal from this action, combined with "actions by SWEPCO to mitigate potential environmental impacts as part of its settlement with the Hempstead County Hunting Club in a companion action[2] challenging the Corps permit," deprive the remaining organizational plaintiffs of standing to proceed further with this action; and (2) because completed design work has "eliminated all but less than 0.000046 acres of the remaining discharges authorized by the Corps permit,"[3] this matter is now moot because "there is no longer

---

[2] In *Hempstead County Hunting Club, Inc. v. Southwestern Electric Power Company, Inc.*, No. 4:10CV4098 (D. Ark.), the parties filed the non-confidential terms of the settlement agreement reached by the plaintiff and SWEPCO. The terms include various environmental and remedial measures SWEPCO agreed to perform in order to preserve the "ecological attributes" of the area, such as providing funding, performing testing, monitoring and installing technology related to "carbon capture and sequestration," installing "both a clay and synthetic liner for any coal combustion residuals" on the Turk Plant property, limiting future development and construction, complying with the "Cross-State Air Pollution Rule" for certain emissions at the Turk Plant, and using certain fuel for operation of the Turk Plant. (Filing 242-1 in Case No. 4:10CV4098.)

[3] The "permit" at issue is the permit issued to SWEPCO by the United States Corps of Engineers under section 404 of the Clean Water Act. As described by the Eighth Circuit Court of Appeals in a decision affirming the district court's grant of Plaintiffs' motions for preliminary injunction in this case, the final § 404 permit "allowed SWEPCO to discharge 'dredged and/or fill material' into 8.07 acres of wetlands (5.6 acres prospectively as well as the 2.47 acres filled without authorization) and into or along 8,150 linear feet of streams. The permit also authorized the placement of several transmission lines across the Little and Red Rivers and the disturbance of 0.06 acres of streambed within the Little River in connection

any Corps permitting decision that could be meaningfully informed by further review of potential impacts under the National Environmental Policy Act ["NEPA"] or Clean Water Act ["CWA"]."  (Filings 201 & 203.)

### I. Motion to Dismiss for Lack of Standing

SWEPCO argues that the Eighth Circuit Court of Appeals "concluded that the plaintiffs in this action had standing based solely on the injuries alleged by Mr. Reynolds and Mr. Mills."  Because Reynolds and Mills have now been dismissed from this action, SWEPCO asserts, the remaining organizational plaintiffs (Sierra Club, National Audubon Society, Audubon Arkansas) "can no longer rely on any alleged injuries to [the dismissed individual plaintiffs] to satisfy the requirements for associational standing."  (Filing 202 at CM/ECF pp. 7-8.)

> Article III establishes three elements as a constitutional minimum for a party to have standing:  (1) "an injury in fact," meaning "the actual or imminent invasion of a concrete and particularized[4] legal interest"; (2) a causal connection between the alleged injury and the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision of the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Organizations like the Sierra Club, the National Audubon Society, Audubon Arkansas, and the Hunting Club "can assert the standing of their members," *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), so long as (1) the individual members would have standing to sue in their own right; (2) the organization's purpose

---

with the placement of a cooling water intake structure.  The permit required SWEPCO to provide compensatory mitigation for the authorized impacts by enhancing and protecting stream channels on site."  *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 984 (8th Cir. 2011).  A copy of the permit may be found at AR003276.

[4]"Particularized" means that "the injury must affect the plaintiff in a personal and individual way."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992).

3

> relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members.

*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 985-86 (8th Cir. 2011) (parallel citations omitted). When organizations assert the standing of their members, as is the case here, "generalized harm to the forest or the environment will not alone support standing, [but] if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers*, 555 U.S. at 494. The Supreme Court's cases dealing with "the law of organizational standing . . . have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498.

The party invoking federal jurisdiction has the burden of establishing the elements of standing. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The parties agree[5] that this case is beyond the pleading stage during which "general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, and is instead at the summary-judgment stage where the plaintiff can no longer rest on mere allegations.

While "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing," *Lujan*, 504 U.S. at 562-63, the "injury in fact" requirement for standing "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 563. At this stage of the litigation, it means that Plaintiffs

---

[5]*See* Filing 202, SWEPCO's Br. at CM/ECF p. 4; Filing 205, Pls.' Br. at CM/ECF p. 2.

must "submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by [Defendants'] activities . . . , but also that one or more of [Plaintiffs'] members would thereby be 'directly' affected apart from their '"special interest" in th[e] subject.'" *Id.* (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). However, "[i]njury in fact necessary for standing need not be large; an identifiable trifle will suffice." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 988 (internal quotation & citation omitted).

The organizational plaintiffs have filed five affidavits[6] of Sierra and Audubon members that presumably seek to establish that these members have "sustained or faced the threat of . . . 'injury in fact'" from the dredge and fill activities authorized by the § 404 permit. *Friends of the Earth, Inc. v. Laidlaw Environ. Svs., Inc.*, 528 U.S. 167, 181 (2000). These affidavits are summarized below:

> ***Fred Harrington:*** This Sierra Club member lives in Mena, Arkansas, and "regularly navigate[s] the Little River in the area of the Turk Plant Site" in his boat. He participates in "fishing for white bass and bird watching on these trips," the most recent of which was April 2011. Harrington has been boating, fishing, and birding on the Little River for seven years. Harrington is "concerned about impacts from filling wetlands, running powerlines through the area, and withdrawing water from the Little River" and "the larger impacts of air pollution from the coal[-]fired power plant once it becomes operational. The mercury from the stacks will potentially impact the wetlands and the fish and wildlife even more than the initial filling and physical disturbance." Harrington says he "intend[s] to continue recreating on the Little River and in the area around the Turk Plant." (Filing 205 at CM/ECF p. 19.)
>
> ***Georgia Enoch:*** Sierra Club member Georgia Enoch lives near Texarkana, Arkansas, and is a birdwatcher who enjoys "taking walks and birdwatching around Millwood Lake in the area nearby the Turk Plant." This fall Enoch "intend[s] to visit the area again to watch for migratory

---

[6]SWEPCO has not objected to the filing of these affidavits.

birds including geese." Enoch is "concerned about the negative impacts that the Turk Plant might have on the area." She "believe[s] the wetlands and bodies of water in the area to be important habitats for birds and other wildlife" and she does "not want SWEPCO to fill in wetlands, run power lines through wetlands, build intake structures, and draw massive amounts of water from the Little River." Enoch's "other concerns" with the Turk Plant include "the air pollution it will pump out and drop on the whole area." Enoch "depend[s] on the Army Corps of Engineers to look seriously at the environmental impacts of this coal fired power plant and [is] upset that it failed to require a full environmental review and failed to require the Turk Plant to locate somewhere less damaging." (Filing 205 at CM/ECF p. 20.)

***Gail Louise Gilbert:*** Gilbert is a Sierra Club member who lives in Texarkana, Arkansas, and visits the Millwood Lake and Little River areas "often." She has camped, fished, boated, and picnicked on Millwood Lake for decades. Gilbert is "concerned about the negative impacts of emissions, particularly mercury, and the destruction of habitat and aesthetic value around the Turk Plant site," which she observed "this summer." She "fear[s] that filling in wetlands, stringing power lines through sensitive areas, and sucking large amounts of water out of the ecosystem will harm the overall health of people and wildlife, as well as the value of the ecosystem." Gilbert is "horrified that SWEPCO went ahead and built this tremendous coal fired plant, and that the U.S. Army Corps of Engineers permitted it to happen, without properly considering the damage it would cause." (Filing 205 at CM/ECF p. 21.)

***Daniel Scheiman:*** This member of the National Audubon Society lives in Little Rock, Arkansas, and has been a bird-watcher for 24 years. He is the Bird Conservation Director for Adubon Arkansas and has "visited the area around the Turk Plant on many occasions over the past five years, including Millwood Lake, the Little River Bottoms, and Grassy Lake." He visited the Grassy Lake/Little River Bottoms area 14 times in 2007 and 2008 to conduct biological surveys in which he "identified 151 species of birds." Scheiman "intend[s] to continue visiting the area around the Turk Plant site in pursuit of [his] professional, scientific, and aesthetic interests." He is "aggrieved by the construction of the Turk Plant and its intrusion in and around the wetlands and waterbodies of the

area." He does "not believe the Corps of Engineers properly weighed the relevant factors in issuing the Section 404 permit to SWEPCO." (Filing 205 at CM/ECF p. 22.)

*Frances Jo Blackburn:* Blackburn is a member of the Sierra Club and resides in Texarkana, Arkansas. A retired school teacher, Blackburn has "a strong interest in maintaining a clean and healthy environment and natural areas to leave our children and grandchildren." She says she is "concerned about the impact of the proposed SWEPCO Turk plant on the wetlands, streams, air quality, water quality and other parts of the environment in southwest Arkansas and beyond, including the Little River bottomlands and the ecologically-sensitive cypress swamp areas in the areas surrounding the proposed plant site . . . ." She is "also very concerned about the exposure that I, my family and others in southwest Arkansas and in the State as a whole will have to airborne contamination from emissions from the proposed plant, and from contamination of water from such emissions and from stormwater runoff from the plant." (Filing 205 at CM/ECF p. 25.)

SWEPCO contends that none of these affidavits satisfies the requirement for associational standing that "at least one individual member will be adversely affected in his or her 'activities or pastimes' by the authorized activity." (Filing 206 at CM/ECF p. 206.) *See Sierra Club v. Morton*, 405 U.S. 727, 735 (1972).

In the Eighth Circuit Court of Appeals' decision affirming the district court's grant of Plaintiffs' motions for preliminary injunction in this case, *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 985-86, the court found that National Audubon Society member and then-plaintiff Charles Mills alleged adequate injury in fact for standing purposes based on his statements that he "is an avid bird watcher and nature photographer in the Grassy Lake area" and his "concern that plant construction would affect one of the most beautiful areas he has visited." *Id.* at 989. Those statements, combined with the fact that "[t]he record suggests that dredging or filling portions of the Little River, installing the water intake structure, and erecting electrical transmission lines would injure those interests," was enough for the court to conclude

7

that "the threat of harm to Mills's aesthetic interests constitutes an adequate injury in fact." *Id.*

Although Mills is no longer a party to this case, Plaintiffs have submitted two affidavits from Sierra Club and Audubon Society members that set forth the same aesthetic interests and concerns Mills had, and which the Eighth Circuit Court of Appeals found adequate to constitute injury in fact for standing purposes in this case. Specifically, Audubon Society member Daniel Scheiman states that he has been a bird-watcher for 24 years; he has visited the area around Turk Plant on many occasions over the past five years; he has visited the Grassy Lake area 14 times in 2007 and 2008 to conduct biological surveys involving 151 species of birds; he intends to visit this same area to pursue these scientific and aesthetic interests in the future; and he is "aggrieved" by the Turk Plant's "intrusion in and around the wetlands and waterbodies of the area." (Filing 205 at CM/ECF p. 22.) Similarly, Sierra Club member Georgia Enoch says she is a birdwatcher who enjoys birdwatching and walking in the Millwood Lake area near the Turk Plant; she "intend[s] to visit the area again to watch for migratory birds including geese"; she is "concerned about the negative impacts that the Turk Plant might have on the area" because she "believe[s] the wetlands and bodies of water in the area to be important habitats for birds and other wildlife"; and she does "not want SWEPCO to fill in wetlands, run power lines through wetlands, build intake structures, and draw massive amounts of water from the Little River." (Filing 205 at CM/ECF p. 20.)

Because the interests and concerns reflected in Scheiman's and Enoch's affidavits mirror those of Mills, and because the record—according to the Eighth Circuit Court of Appeals—"suggests that dredging or filling portions of the Little River, installing the water intake structure, and erecting electrical transmission lines would injure those interests," the plaintiffs have established adequate injury in fact for standing purposes.

8

While it is true that the affidavits referenced above do not specifically allege that the affiants have refrained from or curtailed bird-watching due to their concern about the occurrence of activities authorized by the § 404 permit, *see Friends of the Earth, Inc.*, 528 U.S. at 182-83 (describing affidavits stating that affiants "no longer engaged" in activities due to concern about discharge of illegal and harmful pollutants), the affidavits and record do establish that: (1) the wetlands and bodies of water in the Turk Plant area are habitats for birds and other wildlife; (2) some of the organizational plaintiffs' Arkansas members who have submitted affidavits in this case have frequently used the Turk Plant area to further their scientific, professional, or aesthetic interests in bird-watching and wish to do so in the future; (3) these members are "aggrieved" and "concerned" about SWEPCO's intrusion in, filling in, and running power lines through, wetlands that are bird habitats in the Turk Plant area; and (4) "dredging or filling portions of the Little River, installing the water intake structure, and erecting electrical transmission lines would injure" the bird-watching interests of these organizational members, and at least some of those actions are authorized under the § 404 permit at issue. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 989.

This is enough to conclude that at least one identified member of the plaintiff organizations will suffer, or has suffered, particularized harm to their aesthetic, recreational, or scientific interests and bird-watching activities in the Turk Plant area due to actions taken by intervenor defendant SWEPCO under the § 404 permit issued by the defendant Corps of Engineers. *Morton*, 405 U.S. 735. Therefore, SWEPCO's motion to dismiss based on a lack of standing must be denied.

## II. Motion to Dismiss Plaintiffs' Claims as Moot

SWEPCO next moves to dismiss this case as moot because "all but less than 0.000046 acres of the remaining discharges authorized by the Corps permit" have been completed, making further Corps review of potential impacts under the NEPA or CWA meaningless. (Filing 203.)

>Two varieties of mootness exist: Article III mootness and prudential mootness. Article III mootness arises from the Constitution's case and controversy requirement: Article III of the United States Constitution limits the jurisdiction of the federal courts to actual, ongoing cases and controversies. When, during the course of litigation, the issues presented in a case lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief, the case is considered moot. If an issue is moot in the Article III sense, we have no discretion and must dismiss the action for lack of jurisdiction.
>
>On the other hand, prudential mootness, the cousin of the mootness doctrine, in its strict Article III sense, is a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration. Even if a court has jurisdiction under Article III to decide a case, prudential concerns may militate against the use of judicial power, i.e., the court should treat the case as moot for prudential reasons.

*Ali v. Cangemi*, 419 F.3d 722, 723-24 (8th Cir. 2005) (internal quotations, alterations & citations omitted). While the Eighth Circuit Court of Appeals has recognized these two types of mootness, "little is gained by struggling with the distinctions between the mootness that arises from Article III and that which results from remedial discretion." 13C Charles Alan Wright, et al., *Federal Practice & Procedure* § 3533.3 (3d ed., Westlaw 2011). "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief. A wise answer to this question is always bound by the facts of the specific case." *Id.*

As described by the Eighth Circuit Court of Appeals, the § 404 permit at issue in this case:

>allowed SWEPCO to discharge "dredged and/or fill material" into 8.07 acres of wetlands (5.6 acres prospectively as well as the 2.47 acres filled without authorization) and into or along 8,150 linear feet of streams. The permit also authorized the placement of several transmission lines

> across the Little and Red Rivers and the disturbance of 0.06 acres of streambed within the Little River in connection with the placement of a cooling water intake structure. The permit required SWEPCO to provide compensatory mitigation for the authorized impacts by enhancing and protecting stream channels on site.

*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 984. *See* AR003276 (copy of permit).

According to SWEPCO, "[t]he last remaining discharge authorized by the Corps permit is related to the installation of the water intake in the Little River," for which the permit authorized "the disturbance of 0.06 acres of streambed within the Little River." (Filing 204 at CM/ECF p. 8.)[7] Specifically, "the only remaining authorized discharge required to complete the intake structure is a single boring through the bed of the Little River for the installation of a six-inch air burst line and straightening or replacing one piling that is no longer plumb as a result of being struck by trees during periods of high river flows in the spring." (Filing 204-1, Aff. Joseph G. Deruntz, Project Manager for American Electric Power Service Corporation & Turk Plant Project, at ¶ 11.) This work "will affect an estimated two (2) square feet of the river bed," *id.*, which is "approximately 0.000046 acre, or approximately 0.00086% of the 5.6 acres of total impacts to jurisdictional waters authorized by the permit. Thus, the authorized discharges are more than 99.999% complete." (Filing 204, SWEPCO's Br. at CM/ECF p. 9 n.14.)

---

[7]The water intake structure "consists of a submerged 36-inch water intake pipe and 6-inch air burst line extending from the left descending bank to a point near the center of the river approximately ten feet above the river bottom. The pipe is supported on a steel frame consisting of vertical piles driven into the river bed that are connected by horizontal beams on which the intake pipe will rest." (Filing 204-1, Aff. Joseph G. Deruntz, Project Manager for American Electric Power Service Corporation & Turk Plant Project, at ¶ 11.)

11

As of July 2011, Turk Plant construction was 73% complete with expenditures of $1.5 billion and a scheduled commercial operation date of October 2012. (Filing 204-1, Aff. Joseph G. Deruntz, Project Manager for American Electric Power Service Corporation & Turk Plant Project, at ¶ 8.)

Plaintiffs' Amended Complaint for declaratory and injunctive relief alleges that in issuing the § 404 permit to SWEPCO, the Corps failed to comply with the National Environmental Policy Act of 1969, the Clean Water Act, and implementing regulations issued by the White House Council on Environmental Quality, the Corps of Engineers, and the U.S. Environmental Protection Agency by failing to follow various procedural and substantive requirements during SWEPCO's permit-application process, thereby making the permit "null and void, and of no effect."[8] (Filing 66.)

Plaintiffs request several forms of relief, including a declaration that the § 404 permit is void; an injunction against the Corps prohibiting "dredge and fill activities contained in the Permit"; revocation of the permit; an injunction prohibiting the defendants from "taking any new action on any new permit application for this project until they have analyzed the entire proposed development pursuant to NEPA and the

---

[8]Specifically, Plaintiffs allege that the Corps failed to timely prepare an Environmental Impact Statement ("EIS") when it received SWEPCO's permit application; allowed SWEPCO to begin construction on the Turk Plant and to fill regulatory wetlands on the site without a permit; failed to prepare the EIS, retain a contractor to do so, or independently evaluate information provided by SWEPCO in support of its permit application; failed to provide various documents, as well as to provide a meaningful opportunity to review and comment upon key environmental documents; affirmatively misrepresented the status of the NEPA process in SWEPCO's application for the permit; issued a Department of the Army Permit Evaluation and Decision Document that did not meet NEPA requirements to analyze alternatives and direct, indirect, and cumulative impacts; and approved mitigation measures without analysis. (Filing 66.)

Clean Water Act"; an order compelling the Corps to follow NEPA, the CWA, and relevant regulations "to prepare any future environmental documentation regarding the proposed Project"; and an order halting further construction of the Turk Plant and awarding Plaintiffs costs and attorney fees. (Filing 66.)

Many federal courts have dismissed similar claims as moot based on substantial completion of projects that were at the heart NEPA disputes. *See Sierra Club v. United States Army Corps of Engineers*, 277 Fed. Appx. 170, 2008 WL 2048359 (3rd Cir. 2008) (filling of all but 0.12 acres of 7.69 acres of wetlands allowed by § 404 permit and substantial completion of construction on top of former wetlands rendered permit challenge prudentially moot; while court could "theoretically protect" remaining wetlands, preserving two small remaining parcels of wetlands that were separated by New Jersey Turnpike would not constitute "meaningful" relief); *One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890 (8th Cir. 2004) (NEPA action to stop modification of highway interchanges rendered moot by facts that interchanges were 100% completed and open to traffic, making it impossible to preserve status quo; noting that plaintiffs could have avoided this result by seeking stay pending appeal); *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1173 (8th Cir. 1994) (same); *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759 (8th Cir. 2004) (because procedural mistake under Endangered Species Act was cured, violation rendered prudentially moot); *Bayou Liberty Ass'n, Inc. v. United States Army Corps of Engineers*, 217 F.3d 393, 396 (5th Cir. 2000) (NEPA suit requesting injunctive and declaratory relief was moot when construction authorized by permit was substantially completed; stating that substantial or complete construction is enough to moot case, "at least in the absence of blatant bad-faith violations"); *Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935 (5th Cir. 1982) (while completion of project alone might not moot claim for injunctive relief for NEPA violations, because plaintiffs failed to seek to enjoin construction and the disputed project was completely constructed and fully occupied, plaintiffs could not prevail unless they showed blatant NEPA violations and that the value of requested relief outweighed interests that would be adversely affected if relief was granted).

Indeed, this is a very close case. But, after carefully reading the opinion of the Court of Appeals in this case, I reluctantly conclude that the facts of this case do not clearly indicate that changed circumstances have "forestalled any occasion for meaningful relief." 13C Charles Alan Wright, et al., *Federal Practice & Procedure* § 3533.3. Under the circumstances in this case—that is, where it is unclear the degree to which performance of the remaining work authorized under the § 404 permit would harm the interests of the plaintiffs' members, making it equally as unclear whether the remedy of enjoining further activity under the permit would be "meaningful"; where it is not apparent that the Corps' alleged procedural and substantive irregularities in the permit process have been corrected; where activities under the permit and overall construction of the Turk Plant are not completed and the plant is not yet operational; where there are allegations of affirmative misrepresentations by the Corps during the permit process; and where SWEPCO made "repeated decisions to proceed with plant construction even in the absence of administrative authority" and "repeatedly ignor[ed] administrative and legal challenges and a warning by the Corps that construction would proceed at its own risk," *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 991[9]—I conclude that this matter is not moot, and SWEPCO's motion to dismiss on that basis must be denied.[10] *See, e.g., Airport*

---

[9]The Eighth Circuit Court of Appeals referred to this activity as "bureaucratic steam roll[ing]," resulting in harm that "was largely self[-]inflicted." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 991 & 997.

[10]Because I have found that SWEPCO's motion to dismiss based on mootness must be denied, I need not address the plaintiffs' argument that their claims are capable of repetition yet evading review. In any event, "NEPA cases have not usually applied this exception." Daniel R. Mandelker, *NEPA Law and Litigation 2d* § 4:30 (2011). *See also Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1173 (8th Cir. 1994) (NEPA action to enjoin highway construction project did not evade review for purposes of exception to mootness doctrine because future projects "may be sufficiently time-consuming so as to permit appellate review"); *Bayou Liberty Ass'n, Inc. v. United States Army Corps of Engineers*, 217 F.3d 393, 398 (5th Cir. 2000) (exception to mootness doctrine did not apply because "there are methods available to halt the construction and receive full review of the Corps' procedures before the construction is substantially completed or the wet-lands are destroyed").

*Neighbors Alliance, Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996) (NEPA case challenging proposed upgrade of airport runway not moot even though construction was substantially completed because if defendants failed to comply with NEPA, court could order that runway be closed or could restrict use until defendants complied with NEPA; stating that "courts still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA").

Accordingly,

IT IS ORDERED:

1. The Motion to Dismiss for Lack of Standing (filing 201) filed by Southwestern Electric Power Company is denied;

2. The Motion to Dismiss Plaintiffs' Claims as Moot (filing 203) filed by Southwestern Electric Power Company is denied;

3. The Motion for Leave to File Reply in Support of Motion to Dismiss Plaintiffs' Claims as Moot (filing 209) filed by Southwestern Electric Power Company is granted and its reply brief has been considered by the court.

DATED this 16th day of November, 2011.

BY THE COURT:
s/ *Richard G. Kopf*
United States District Judge