UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| Sierra Club, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 4:10-cv-04017-RGK |
| v. | ) | |
| | ) | Electronically Filed |
| United States Army | ) | |
| Corps of Engineers, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CONSENT DECREE

WHEREAS, the Sierra Club, National Audubon Society, and Audubon Arkansas (collectively "Plaintiffs") filed a Complaint on February 11, 2010, and a First Amended Complaint on July 16, 2010 (collectively, "Complaints") against the United States Army Corps of Engineers and the District Engineer of the Vicksburg District (the "COE") challenging a permit issued on December 17, 2009 (the "COE Permit") to Southwestern Electric Power Company ("SWEPCO") (Plaintiffs and SWEPCO are collectively referred to as the "Parties") for certain work associated with the construction of the John W. Turk, Jr. Power Plant (the "Turk Plant"); and

WHEREAS, the Complaints alleged claims for injunctive and declaratory relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ("APA") based on allegations that the COE permit failed to conform to the requirements of the National Environmental Policy Act, 42 USC §§ 4321-70a ("NEPA"), and its implementing regulations, and the Federal Water Pollution Control Act, 33 USC § 1344 (the "CWA"), and its implementing regulations; and

1

WHEREAS, SWEPCO timely intervened in that action and has vigorously defended its permit; and

WHEREAS, in their Complaints, Plaintiffs allege that the COE failed to properly analyze, evaluate, and mitigate the environmental impacts associated with the construction of the Turk Plant in connection with the issuance of the COE Permit; and

WHEREAS, the COE and SWEPCO have denied and continue to deny the allegations in the Complaint and maintain that the COE's actions conform to the applicable requirements of NEPA, the CWA, and other applicable law, and that relief is not available under the APA or other applicable law; and

WHEREAS, the Parties have negotiated in good faith and have reached a settlement of the issues raised in the Complaints; and

WHEREAS, the Parties hereby consent to entry of this Consent Decree without further trial of any issue, and without further adjudication or determination of liability; and

WHEREAS, the Parties agree, and the Court by entering this Consent Decree finds, that this Consent Decree is fair, reasonable, and in the public interest; and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter and that the preliminary injunction previously issued in this matter should be dissolved;

NOW, THEREFORE, without any admission of fact or law, without conceding any jurisdictional or other claims or defenses, and without any findings with respect to the merits of the allegations presented in the Complaints; it is hereby ORDERED, ADJUDGED, AND AGREED as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 701 *et seq.*

2.      Venue is proper in this district under 28 U.S.C. § 1391(e) because the Turk Plant is located in this district.

## II.      APPLICABILITY

3.      Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Parties, their successors and assigns.

## III.      DEFINITIONS

4.      "Annual Capacity Factor" means the percent of utilization of a generating unit in any 12-month rolling period, calculated as the total megawatt hours of energy actually produced by the generating unit during that 12-month period divided by the product of the unit's nameplate capacity times 8,760 hours.

5.      "CEMS" or "Continuous Emission Monitoring System" means, for obligations involving particulate matter (PM) emissions under this Consent Decree, the devices defined in 40 C.F.R. § 60.2 and installed and maintained as required by 40 C.F.R. Part 60.

6.      "Clean Energy Resources" means wind power from new Wind Energy Resources or solar power from new Solar Energy Resources.

7.      "Commercial Operation" for the Turk Plant means that construction, commissioning, shakedown and testing has been completed and that the generating unit has been placed in service to provide electricity to the bulk electricity system and is being dispatched by the Southwest Power Pool ("SPP").

8.      "Consent Decree" or "Decree" means this Consent Decree.

9.      "Emission Rate" means the number of pounds of pollutant emitted per million BTU of heat input ("lb/MMBtu"), measured in accordance with this Consent Decree.

10.      "Generation Emergency" means the period of time starting when the Southwest Power Pool (SPP) issues a real-time "Energy Emergency Alert" or when the Balancing Authority

3

issues an "Operating Reserve Warning" or requires "Maximum Emergency Generation," whichever is earlier, for the Balancing Authority which includes Welsh Unit 2 or the Turk Plant and ending twelve (12) hours after the Energy Emergency Alert or Operating Reserve Warning is cancelled or Maximum Emergency Generation is no longer required. "Balancing Authority," "Energy Emergency Alert," "Operating Reserve Warning" and "Maximum Emergency Generation" shall be defined as set forth in SPP Criteria 6 (October 26, 2010 or any superseding criteria) or the SPP Emergency Procedures Manual.

11.     "lb/MMBtu" means pound(s) of a pollutant per million British thermal units of heat input.

12.     "Malfunction" means malfunction as that term is defined under 40 C.F.R. § 60.2.

13.     "MW" means a megawatt or one million watts.

14.     "Parties" means Plaintiffs and SWEPCO.

15.     "Plaintiffs" means Sierra Club, National Audubon Society and Audubon Arkansas.

16.     "$PM_{10}$" means particulate matter less than 10 microns in size.

17.     "Solar Energy Resources" shall mean any new solar generating resource interconnected to the bulk electric system or SWEPCO's distribution system for which a resource analysis has been performed that specifies a long-term average annual capacity factor of twenty (20) percent or greater and, if the resource will be secured through a long-term power purchase agreement, provides for the payment of liquidated damages if minimum annual deliveries of energy consistent with that long-term average are not satisfied.

18.    "Turk Air Permit" shall mean the permit issued to the Turk Plant under the Prevention of Significant Deterioration and the Title V Operating Permit Programs of the Clean Air Act and which is identified as Permit No. 2123-AOP-R0.

19.    "Turk NPDES Permit" shall mean the permit issued to the Turk Plant under the CWA to authorize wastewater discharges and which is identified as Permit No AR0051136.

20.    "Turk Solid Waste Permit" shall mean the permit issued to the Turk Plant under the Arkansas Solid Waste Management Act that allows the disposal of coal combustion byproducts at the Turk Plant and which is identified as Permit No. 0311-S3N.

21.    "Welsh Unit 2" shall mean Unit 2 at SWEPCO's Welsh Power Station in Titus County, Texas.

22.    "Wind Energy Resources" shall mean any new wind generating resource interconnected to the bulk electric system or SWEPCO's distribution system for which a wind resource analysis has been performed that specifies a long-term average annual capacity factor of forty (40) percent or greater and, if the resource will be secured through a long-term power purchase agreement, provides for the payment of liquidated damages if minimum annual deliveries of energy consistent with that long-term average are not satisfied.

### IV.      FUTURE ENERGY RESOURCES

#### A.    Future Development at the Turk Plant Site

23.    SWEPCO shall not construct any additional generating units on the site of the Turk Plant. In addition, during the operation of the Turk Plant, SWEPCO shall not construct any new coal-fired units at any location in Arkansas that is within a 30-mile radius of the Turk Plant site.

### B.   Welsh Unit 2

24.   Beginning on the date that the Turk Plant commences Commercial Operation, SWEPCO will limit the Annual Capacity Factor of Welsh Unit 2 to no more than sixty (60) percent.

25.   SWEPCO will seek all necessary regulatory approvals, and will permanently retire Welsh Unit 2 by December 31, 2014, unless SPP has identified and approved transmission mitigation measures that must be completed prior to the retirement of Welsh Unit 2 that have in-service dates beyond December 31, 2014, in which case SWEPCO will permanently retire Welsh Unit 2 as soon as all required approvals have been issued and all necessary transmission mitigation measures have been completed, but no later than December 31, 2016.

### C.   Clean Energy Resources

26.   During the period from October 30, 2011 through December 31, 2014, SWEPCO and its affiliates, including any entities that own an interest in any coal-fired generating unit operated by SWEPCO or its affiliates that is located in Arkansas, Louisiana, Oklahoma or Texas, will construct or secure the energy from a total of 400 MW (nameplate rating) of new Clean Energy Resources.   Power purchase agreements to secure the energy from Clean Energy Resources shall have a minimum term of 20 years.   Renewable Energy Certificates (RECs) or other clean energy attributes from these resources shall not be sold or transferred to any third party, or used to meet any existing requirements for clean or renewable energy.   Nothing in this Consent Decree shall preclude SWEPCO from relying on investments made, or power purchases contracted, pursuant to this Consent Decree to demonstrate compliance with, seek RECs for, or otherwise satisfy the requirements of or participate in any federal, state, or local statutory or regulatory programs related to Clean Energy Resources or climate change related requirements, so long as those programs are promulgated after the effective date of this Consent Decree.

27.    New wind projects developed to satisfy this commitment must be sited consistent with the U.S. Fish and Wildlife Service Interim Guidance for minimizing impacts from wind development on birds and wildlife, dated May 13, 2003, and be located outside of any Important Bird Areas identified by the National Audubon Society (*see* http://iba.audubon.org/iba/siteSearch.do) as of the date of this Consent Decree.

## V.    TURK PLANT OPERATIONS

### A.    Total $PM_{10}$ Emission Rate

28.    SWEPCO shall determine compliance with the Total $PM_{10}$ Emission Rate established in the Turk Air Permit via a stack test each year performed pursuant to the requirements established in the Turk Air Permit using the reference testing and monitoring methods and procedures specified in 40 C.F.R. Part 60, Appendix A1, Method 5 or Method 17 (filterable only), and Method 202 (condensable only), as of the Effective Date of this Consent Decree. At its option, SWEPCO may use any method that is approved by EPA subsequent to the Effective Date of this Consent Decree. Use of any particular method shall conform to the EPA requirements specified in 40 C.F.R. Part 60, Appendix A, or any federally approved method contained in the Arkansas SIP.

29.    SWEPCO will examine the Total $PM_{10}$ Emission Rate measured during stack tests performed within the first three years after commencement of Commercial Operation of the Turk Plant. Within 120 days after completion of the annual stack test required in the third year of Commercial Operation, SWEPCO shall evaluate the data to determine whether a lower Total $PM_{10}$ Emission Rate can be established pursuant to this Paragraph that would apply during normal operation of the Turk Plant, without including periods of start-up, shut down or Malfunction. If the highest measured total $PM_{10}$ Emission Rate measured during the stack tests is 0.022 lb/MMBtu or higher, no lower Total $PM_{10}$ Emission Rate will be established. If the

7

highest measured Total $PM_{10}$ Emission Rate is less than 0.022 lb/MMBtu, SWEPCO shall calculate a lower Total $PM_{10}$ Emission Rate equal to the highest measured Total $PM_{10}$ Emission Rate plus one-half the difference between the highest measured Total $PM_{10}$ Emission Rate and 0.025 lb/MMBtu.

30.     If the highest measured value is lower than 0.022 lb/MMBtu, SWEPCO shall submit an application to ADEQ for an administrative permit amendment to include the lower Total $PM_{10}$ Emission Rate calculated in accordance with paragraph 29 as a separate requirement in the Turk Air Permit that applies to the main boiler during normal operations, but not during periods of start-up, shut down, or malfunction.  If ADEQ will not process the administrative permit amendment to include the additional lower Total $PM_{10}$ Emission Rate in the Turk Air Permit through an administrative permit amendment without requiring public notice and comment, SWEPCO will withdraw its application.  In any event, thereafter, SWEPCO will continue to compare the results of the annual Total $PM_{10}$ emission stack tests against the value calculated in accordance with the requirements of paragraph 29, and report that comparison and the results of all annual compliance tests to ADEQ as part of the Title V reporting process.

**B.     PM CEMS**

31.     By no later than December 31, 2014, SWEPCO shall install and operate a PM CEMS on the main boiler at the Turk Plant.  Notwithstanding the availability of this monitoring, the methods for determining compliance with the PM emission limitations in the Turk Air Permit (including any limit established pursuant to paragraph 30 of this Consent Decree) shall be based on annual compliance stack tests.  SWEPCO will furnish the data generated by the PM CEMs to ADEQ upon request and operators may use the data to assist them in assessing the performance of the PM emission control equipment.

32.     Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (February 24, 1997)) concerning the use of data for any purpose under the Clean Air Act generated either by the reference methods specified herein or otherwise.

### C.     Wastewater Discharges

33.     Within the first full year of Commercial Operation of the Turk Plant, SWEPCO will perform a second round of sampling and conduct a priority pollutant scan to confirm that the wastewater quality discharged from Outfall 001 is consistent with the basis for the conditions incorporated into the Turk NPDES Permit.

### D.     Landfill Monitoring

34.     During the first four years after the Turk Plant commences Commercial Operation, SWEPCO will perform groundwater quality monitoring in accordance with the requirements of the Turk Solid Waste Permit on a quarterly basis. Thereafter, the frequency of groundwater monitoring shall be reduced to semi-annual, consistent with the terms of the Turk Solid Waste Permit, unless assessment monitoring requirements are triggered pursuant to Ark. Reg. §22.1205.

35.     For ten years following the closure of the Turk Plant landfill facility, SWEPCO will conduct post-closure groundwater monitoring in accordance with the terms of the Turk Solid Waste Permit and any post-closure monitoring plan approved by ADEQ. Prior to the termination of this Consent Decree, SWEPCO will request a minor modification to its post-closure monitoring plan and solid waste permit to incorporate this extended monitoring period in accordance with Ark. Reg. § 22.308(d).

### E.     Solid Fuel Characteristics

36.     SWEPCO shall use coal sourced from or that originated from mines within the Powder River Basin, or sub-bituminous coal with similar sulfur characteristics ("Powder River Basin Coal"), for its unit at the Turk Plant, provided there is no Force Majeure Event that prevents SWEPCO, in whole or in part, from carrying out such obligation. If there is a Force Majeure Event, SWEPCO shall not be considered to be in default hereunder for failure to utilize Powder River Basin Coal for the duration of the Force Majeure Event. For purposes of this paragraph, a "Force Majeure Event" means an event or circumstance which prevents SWEPCO from performing its obligation to use Powder River Basin Coal that is not the result of SWEPCO's intentional conduct or negligence and which by the exercise of commercially reasonable diligence, SWEPCO is unable to overcome or avoid. Force Majeure Event includes, but is not limited to, an event or occurrence beyond the control of SWEPCO, such as without limitation, acts of God, war, insurrection, riots, nuclear disaster, strikes, labor disputes, threats of violence, terrorism, Powder River Basin Coal shortages, labor and material shortages, fires, explosions, floods, river freeze-ups, tornados, breakdowns or damage to mines, plants, equipment, or facilities, interruptions to or slowdowns in transportation, railcar shortages, barge shortages, embargoes, orders or acts of civil or military authority, laws, regulations, or administrative or judicial rulings, requirements of regional transmission operators, the North American Electric Reliability Corporation, the Federal Energy Regulatory Commission or total or partial interruptions of SWEPCO's operations which are due to any enforcement action or other administrative or judicial action arising from an environmental law or regulation. With respect to the foregoing, SWEPCO shall not be required to accede to the demands of labor or settle any strike or labor dispute to which it does not agree.

**F.    Future Transmission Line Routing**

37.    SWEPCO shall not site any future transmission lines associated with the Turk Plant across the Nacatoches Ravines Natural Area, the Little River and Bois d'Arc Wildlife Management Area, property currently owned by the Nature Conservancy within Hempstead County, property currently owned by the Arkansas Natural Heritage Commission within Hempstead County, property currently owned by the Hempstead County Hunting Club, which includes the high ecological value Grassy Lake area, or along the Kiamichi Railroad in Hempstead County.  Nothing in this paragraph is intended to affect SWEPCO's ability to maintain or upgrade service along transmission line routes existing as of the date of this Consent Decree.

## VI.    ADDITIONAL COMMITMENTS

**A.    Mercury Study**

38.    SWEPCO shall perform baseline mercury sampling to assess the conditions existing prior to Commercial Operation of the Turk Plant, according to the Protocol set forth in Exhibit MEH-7 submitted to the Arkansas Public Service Commission in Docket No. 06-154-U, with the following modifications:

(a) To the extent that the Parties to this Consent Decree cannot provide or secure reasonable access to the sampling locations identified in the Protocol, those locations will be eliminated and suitable alternative representative locations to which access can be gained will be sampled;

(b) Sampling times will be scheduled to assure sampling of the largest cross-section of species identified in the Protocol, and will be limited to one round of pre-operational sampling;

(c) The study will consist of one round of pre-operational sampling only; no sampling will be conducted after the Turk Plant commences Commercial Operation;

(d)    The study results will be provided to representatives of Sierra Club and Audubon Arkansas.

**B.    Land Conservation and Energy Efficiency Projects**

39.    By no later than December 31, 2012, SWEPCO will provide a lump sum for land conservation and energy efficiency projects as follows:

(a) the sum of eight (8) million dollars will be provided to The Nature Conservancy for purposes of land conservation in Arkansas;

(b) the sum of two (2) million dollars will be provided to the Arkansas Community Foundation which will provide grants to support policy initiatives in Arkansas, Louisiana, Texas, and/or Oklahoma to promote Clean Energy Resources and energy efficiency measures, including but not limited to the preparation of technical reports and presentation of expert evidence before the state public utility regulatory bodies.

**C.    Attorneys Fees**

40.    Within ninety (90) days after Plaintiffs fulfill all of their obligations set forth in Article VIII of this Consent Decree, SWEPCO will reimburse Plaintiffs the sum of two million dollars ($2,000,000.00) for their reasonable attorneys' fees and costs incurred in the prosecution of this action and other proceedings challenging the Turk Plant. Plaintiffs waive any claim for fees or costs against the COE or the United State for recovery of attorneys' fees or costs incurred in the prosecution of this action.

## VII.    REPORTING REQUIREMENTS

41.    Commencing on January 30 of the first year after the Effective Date of this Consent Decree, and on January 30 of each year thereafter until January 30, 2017, SWEPCO shall provide a written report ("Report") to both Sierra Club and National Audubon Society describing in narrative detail all actions taken by SWEPCO, its affiliates, contractors and consultants to comply with each of SWEPCO's obligations, undertakings and requirements ("SWEPCO's Obligations") contained in Articles IV, V and VI of this Consent Decree during the previous calendar year or portion thereof. Included in each Report, as applicable for the prior

calendar year, shall be the Annual Capacity Factor at Welsh Unit 2, the status of any transmission mitigation measures required prior to the retirement of Welsh Unit 2, the amount of Clean Energy Resources developed or placed in service in that year and the Annual Capacity Factors achieved, any sampling or monitoring data, reports, permit applications, updated plans, or other information submitted to ADEQ to satisfy the terms of this Consent Decree, and the status of the Mercury Study. Sierra Club and National Audubon Society may jointly or individually submit to SWEPCO written questions or requests for additional information regarding SWEPCO's performance under this Consent Decree, to which SWEPCO shall respond within forty-five (45) calendar days of the date of receipt of such questions or requests. Nothing in this Paragraph shall be construed to require the submission of SWEPCO's Confidential Business Information to the Plaintiffs, or to require the duplication of records submitted by SWEPCO to ADEQ.

## VIII.   RESOLUTION OF CLAIMS

42.     Entry of this Consent Decree shall resolve any and all claims of Plaintiffs under NEPA, the CWA, or the APA relating to the COE Permit and any actions taken by SWEPCO at the Turk Plant prior to the Effective Date, including but not limited to those claims and actions alleged or that could have been alleged in this action. Upon Entry of this Consent Decree the preliminary injunction issued in this action shall be dissolved and this Consent Decree shall constitute the final judgment among the Parties.

43.     Upon entry of this Consent Decree Plaintiffs release all claims related to pollutants regulated under any existing permits issued for the Turk Plant that could have been alleged in a challenge to those permits, and any modifications or permit amendments necessary to implement the provisions of this Consent Decree. This release specifically excludes any

action to enjoin, limit, or condition the use of the Kiamichi Railroad to supply coal to the Turk Plant.

44.     Upon lodging of this Consent Decree with the Court, Plaintiffs and SWEPCO shall notify the courts and administrative agencies before which any challenges are pending that affect any existing permits issued to the Turk Plant, or before which any claims that additional authorizations are required are pending, that a pending settlement of the claims asserted in those proceedings has been reached, and, if appropriate, request a stay of further proceedings in those forums.  These notifications shall include, but not be limited to:

> (a) the U.S. Environmental Protection Agency
>
> (b) the Arkansas Public Service Commission
>
> (c) the Arkansas Appellate Courts
>
> (d) the Arkansas Pollution Control and Ecology Commission

45.     Within five (5) business days of the Effective Date of this Consent Decree, Plaintiffs shall withdraw or dismiss with prejudice their claims in the following pending proceedings:

> (a) Petition for Veto of Title V Operating Permit No. AR-2123-AOP-R0
>
> (b) APSC Docket No. 11-154-C
>
> (c) Case No. CA-11-466
>
> (d) APCEC Docket No. 11-014-P
>
> (e) Texas PUCT Docket No. 39-708

and any other pending matters challenging any permit, approval, or authorization for the construction of the Turk Plant.

46.     Plaintiffs covenant not to file or prosecute any administrative or judicial actions opposing the issuance of any permits or authorizations necessary to complete construction and commence Commercial Operation of the Turk Plant, including any modifications necessary to conform the existing permits to the constructed facility, provided that such modifications do not increase the emission rate, discharge rate, or total emissions or mass of pollutants discharged beyond the limits contained in any existing permit.

47.     Plaintiffs further covenant not to file or prosecute any administrative or judicial actions opposing the issuance of any permits, licenses, authorizations, or other approvals necessary to implement the terms of this Consent Decree, or opposing such other orders, permits, licenses, or approvals that may be required to recover the costs of implementing this Consent Decree through wholesale or retail rates.

48.     Plaintiffs covenant not to file or prosecute any administrative or judicial actions challenging the recovery of the costs of the Turk Plant through wholesale or retail rates, including any decision by SWEPCO to include the Turk Plant in rate base for Arkansas customers.

## IX.     FORCE MAJEURE

49.     For purposes of this Consent Decree, a "*Force Majeure* Event" shall mean an event that has been or will be caused by circumstances beyond the control of SWEPCO or any entity controlled by SWEPCO that delays or impedes compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite SWEPCO's reasonable efforts to fulfill the obligation.   "Reasonable efforts to fulfill the obligation" include using reasonable efforts to anticipate any potential *Force Majeure* Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or violation is minimized to the greatest extent possible.

50.     If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which SWEPCO intends to assert a claim of *Force Majeure*, SWEPCO shall notify Plaintiffs in writing as soon as practicable, but in no event later than twenty-one (21) days following the date that the SWEPCO first knew of the event or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.   In this notice, SWEPCO shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by SWEPCO to prevent or minimize the delay or violation, the schedule by which SWEPCO proposes to implement those measures, and SWEPCO's rationale for attributing a delay or violation to a *Force Majeure* Event.   SWEPCO shall adopt all reasonable measures to avoid or minimize such delays or violations.

51.     If SWEPCO materially fails to comply with the notice requirements of this Section, the Plaintiffs may dispute the validity of SWEPCO's claim for *Force Majeure* as to the specific event for which SWEPCO failed to comply with such notice requirement.

52.     The Plaintiffs shall respond to SWEPCO in writing regarding SWEPCO's claim of *Force Majeure* within twenty (20) business days of receipt of the notice provided under the preceding Paragraph.   If the Plaintiffs agree that a delay in performance has been or will be caused by a *Force Majeure* Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event.   In such circumstances, an appropriate modification shall be made pursuant to Article XIV (Modification) of this Consent Decree.

16

53.     If the Plaintiffs do not accept SWEPCO's claim of *Force Majeure*, or if the Parties cannot agree on the length of the delay actually caused by the *Force Majeure* Event, or the extent of relief required to address the delay actually caused by the *Force Majeure* Event, the matter shall be resolved in accordance with Article X (Dispute Resolution) of this Consent Decree.

54.     In any dispute regarding *Force Majeure*, the burden of proof shall be determined in accordance with Arkansas law.

55.     Unanticipated or increased costs or expenses associated with the performance of SWEPCO's obligations under this Consent Decree shall not constitute a *Force Majeure* Event.

56.     The Parties agree that, depending upon the circumstances related to an event and SWEPCO's response to such circumstances, the kinds of events listed below are among those that could qualify as *Force Majeure* Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; fuel supply interruption; acts of God; acts of war or terrorism; and orders by a court, a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs SWEPCO to operate the Turk Plant or Welsh Unit 2 in response to a systemwide (state-wide or regional for the region that includes these units) Generation Emergency.  Depending upon the circumstances and SWEPCO's response to such circumstances, failure of a federal, state or local agency or commission to issue a necessary permit, license, approval or order may constitute a *Force Majeure* Event where the failure of the authority to act is beyond the control of SWEPCO and SWEPCO has taken all reasonable steps to obtain the necessary permit, license, approval or order.

57.     As part of the resolution of any matter submitted to this Court under Article X (Dispute Resolution) of this Consent Decree regarding a claim of *Force Majeure*, the Parties by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by Plaintiffs or approved by the Court or excuse non-compliance with any other requirement of this Consent Decree attributable to a *Force Majeure* event.

## X.     DISPUTE RESOLUTION

58.     The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, including any alleged breach of this Consent Decree by one of the Parties.

59.     The dispute resolution procedure required herein shall be invoked by one party giving written notice to the other party advising of a dispute pursuant to this Section within thirty (30) days of discovery of an area of dispute.  The notice shall describe the nature of the dispute and shall state the noticing party's position with regard to such dispute.  The party receiving such a notice shall acknowledge receipt of the notice, and the Parties shall expeditiously schedule a meeting or telephone conference to discuss the dispute informally not later than fourteen (14) days following receipt of such notice.

60.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the Parties.  Such period of informal negotiations shall extend for thirty (30) calendar days from the date of the first meeting among the disputing Parties' representatives, unless they agree in writing to shorten or extend this period.  During the informal negotiations period, the Parties may also submit their dispute to a mutually-agreed-upon alternative dispute resolution ("ADR") forum if the Parties agree that the

ADR activities can be completed within the 30-day informal negotiations period (or such longer period as the Parties may agree to in writing).

61.     If the Parties are unable to resolve the dispute through the informal process described above, the disputing party waives its rights to further dispute the issue unless it files a petition or other filing with the Court describing the dispute and serves it on the other Parties within sixty (60) days after the informal resolution period ends. The other party shall have forty-five (45) days after the receipt of the petition to file and serve a written response.  The filing party will then have fifteen (15) days to file a reply.

62.     As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties by agreement, or this Court by order, may extend or modify the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution or may excuse non-compliance with any other requirement of this Consent Decree due to a *Force Majeure* Event.  SWEPCO shall not be precluded from asserting that a *Force Majeure* Event has caused or may cause a delay in complying with the extended or modified schedule or has resulted in non-compliance with any other requirement of this Consent Decree, except as otherwise provided for in this Consent Decree.

63.     The Parties' sole and exclusive remedy for breach of this Agreement shall be an action for specific performance or injunction. In no event shall any Party be entitled to monetary damages for breach of this Agreement.

## XI.   NOTICES

64.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to Plaintiffs:

Joanne Spalding
Senior Managing Attorney
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105

Lorraine A. Sciarra
Vice President and General Counsel
The National Audubon Society
225 Varick Street
New York, NY 10014

As to SWEPCO:

Venita McCellon-Allen, President
Southwestern Electric Power Company
428 Travis
Shreveport, LA 71101

With a copy to:

Janet J. Henry, Legal Department
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, Oh 43215

65.    All notifications, communications or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or delivery service; (b) certified or registered mail, return receipt requested; or (c) electronic transmission, provided the receiving party acknowledges receipt, and unless the recipient is not able to review the transmission in electronic form. All notifications, communications and transmissions (a) sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service. All notifications, communications, and submissions made by electronic means

shall be electronically signed, and shall be deemed submitted on the date that sender receives written or electronic acknowledgment of receipt of such transmission.

66.    Any party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XII.    EFFECTIVE DATE

67.    The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.  The Parties consent to entry of this Consent Decree without further notice.

## XIII.    RETENTION OF JURISDICTION

68.    The Court shall retain jurisdiction over Plaintiffs and SWEPCO and the subject matter of this Consent Decree after the Effective Date for purposes of enabling Plaintiffs and SWEPCO to apply to the Court for such further orders, direction, or relief as may be necessary to implement, interpret, modify and enforce the terms and conditions of the Consent Decree, and to resolve disputes under Article X (Dispute Resolution) until termination of the Decree.

## XIV.    MODIFICATION

69.    Except as provided in Paragraph 62, the terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XV.    GENERAL PROVISIONS

70.    This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or

regulations. The emission rates set forth herein do not relieve Owners from any obligation to comply with other state and federal requirements.

71.     Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree.

72.     All references in this Consent Decree to statutory or regulatory provisions by specific citation shall refer to the language of those provisions as they exist on the date of lodging of this Consent Decree.

73.     Emissions limits and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.

74.     This Consent Decree does not limit, enlarge or affect the rights of any party to this Consent Decree as against any third parties.

75.     This Consent Decree constitutes the final, complete and exclusive agreement and understanding between the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings between the Parties related to the subject matter herein. No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

## XVI.  SIGNATORIES AND SERVICE

76.     Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

77.     This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

22

### XVII.  TERMINATION OF ENFORCEMENT UNDER DECREE

78.     This Consent Decree shall remain an enforceable order of the Court until the Parties agree, or the Court determines in response to a petition by a Party, that (a) the substantive requirements of the Decree have been satisfied, and (b) any applicable permits with respect to those substantive requirements have been obtained by SWEPCO.  The Parties agree that each of the obligations contained in this Consent Decree may be terminated independently of the other obligations upon a demonstration that the obligation has been fulfilled and, to the extent required herein, that obligation has been incorporated into the Turk Air Permit or the Turk Solid Waste Permit.

### XVIII. FINAL JUDGMENT

79.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment in the above-captioned matter, and the preliminary injunction shall be dissolved.

SO ORDERED, THIS __22nd__ DAY OF __December____, 2011.

s/ Richard G. K opf

THE HONORABLE RICHARD G. KOPF
UNITED STATES DISTRICT COURT JUDGE

Signature Page for Consent Decree in:

*Sierra Club, et al.,*

*v.*

*The U.S. Army Corps of Engineers, et al.*, No. 4:10-cv-04017 (W.D. Arkansas)

FOR PLAINTIFF SIERRA CLUB:

12/21/11

Bruce Nilles
Senior Director
Beyond Coal Campaign
Sierra Club

Approved:

Richard H. Mays
Counsel for Sierra Club

24

Signature Page for Consent Decree in:

*Sierra Club, et al.,*

*v.*

*The U.S. Army Corps of Engineers, et al.,* No. 4:10-cv-04017 (W.D. Arkansas)


FOR PLAINTIFF THE NATIONAL AUDUBON SOCIETY:

David Yarnold
President and Chief Executive Officer
The National Audubon Society


Approved:

Richard H. Mays
Counsel for The National Audubon Society

Signature Page for Consent Decree in:

*Sierra Club, et al.,*

*v.*

*The U.S. Army Corps of Engineers, et al.*, No. 4:10-cv-04017 (W.D. Arkansas)

FOR INTERVENOR-DEFENDANT SOUTHWESTERN ELECTRIC POWER COMPANY:

Michael G. Morris
Chairman of the Board
Southwestern Electric Power Company